## MIMS v. CHANDLER.

1.  Where M. furnished a part of the money to purchase a tract of land and C. the balance, C. taking titles in his own name to secure the amount so advanced by him, which was to be repaid by M., it would seem that there was a resulting trust in favor of M., certainly to the extent of the money paid by him.
2.  A receipt in writing for $285, "to be placed on land papers," is not a sufficiently definite memorandum to take a parol agreement for the purchase of land out of the statute of frauds.
3.  Payment of the purchase money is not such part performance as to be sufficient of itself to take a case out of the statute of frauds, but part payment by the purchaser, with possession delivered by the vendor by virtue of the agreement, and improvements made by the purchaser, are sufficient; and a contract for the purchase of land may, under these circumstances, be established by parol proof.
4.  M., a tenant of 212 acres of land, agreed to purchase from his landlord 65 acres of this tract, and paid part of the purchase money, C. paying the balance and taking the title to himself as security for the repayment by M. of such balance.    *Held*, that M.'s subsequent posses-

sion of the 65 acres was not under his former tenancy, but should be referred to a new possession under his agreement to purchase.

5. Upon M.'s payment in full of this balance due to C., the title to these 65 acres should, under the agreement, be made to M., and the Circuit decree erred in permitting the master to make title to M.'s wife.

6. One having full knowledge of the contract between C. and M., purchased this land from C. in consideration of a past due debt owing to him by C. *Held*, that this deed must be set aside as fraudulent and void.

Before ALDRICH, J., Sumter, March, 1883.

This was an action by Timothy Mims against Daniel Wesley Chandler and T. Duncan Chandler. The case is fully stated in the Circuit decree, which was as follows:

This is an action for the specific performance of a contract for the sale of land. Although much time was consumed in the development and argument of the case, the facts are in a narrow compass. Mr. Frierson was the owner of a tract of land containing 212 acres, more or less. The plaintiff Mims was his tenant at a rent of five bales of cotton a year. Frierson says: "I first bargained to sell the land to Mims for $1,500 on a credit of three years, or five bales a year rent. I afterwards agreed to sell him the land for $1,200 cash, and to let the rent of five bales of cotton, which Mims owed me, go in as part payment. Mims paid me $285 and Chandler $15. In thirty days after, Chandler paid me the balance, $900, and received titles for the land."

It appears that when Mims had made his agreement with Frierson, Goodman entered into an agreement to buy the land remaining, after Mims had cut off 65 acres, the tract on which he lived with his wife and children. When the purchase came to be completed, the defendant, D. W. Chandler, paid the purchase money and took the title in his name. Goodman says: "I went in with Mims and thought Frierson was to make the title, but Chandler said he would take the title in his own name, because he knew Mims could not meet the payments next year, and he could indulge him." Mims had married Chandler's aunt.

When the land was bought from Frierson, Mims says Chandler told him to raise $300, or as near that amount as he could, and that he would give one and two years to pay the balance, $400;

that he sold five bales of cotton for $260, took $25 out of his pocket, and Chandler advanced the other $15, which he charged in his books to Mims's account; that on December 21, 1880, he and Goodman went to Chandler to get their titles; that he made the title to Goodman and took his mortgage; he then said to Mims, "I can't draw your papers, it is late now; but I will have them fixed up by Dr. Mayes, and send them to you. Go home, go to work, and make yourself easy;" he gave the following receipt: "$285. Mayesville, S. C., Dec. 21, 1880. Received of Timothy Mims two hundred and eighty-five dollars, to be placed on land papers. (Signed) D. W. Chandler."

He further says he bought the land for a home, because his wife's relations lived in the neighborhood; that he went to work with his son, cleared, ditched, and drained about ten acres, made it good planting land and improved the health of the place; that in September, 1881, he told Chandler he had picked out three bales of cotton, who replied, "If you will gin it out and bring it to me, I will make your title, take your mortgage, and wait on you until next fall for the balance;" that he delivered him the three bales in payment for the land, sent him two bales, and a few days after carried him the third. "When I asked him for the title, he said, 'My business is such I can't fix them up to-day, but will send or bring them to you in a few days.' He gave me the two following receipts: '$98.28. Received. Mayesville, September 15, 1881, of Timothy Mims, $98.28, to be placed on account. (Signed) Daniel Chandler.' '$50. Received. Mayesville, S. C., of Tim. Mims, ($50) fifty dollars on account. September 15, 1881. (Signed) D. W. Chandler.'"

Mims said he was always ready to carry out his part of the contract, but soon after he had made the last payments he received a letter from Chandler, ordering him off the place. He then "went to see him, when Chandler said, 'I understand you are going to offer the balance of the money due on the land. I will not take it, nor will I make you a title.' A day or two after I commenced this suit, D. W. Chandler sold this land to his brother Duncan. When Duncan bought, he knew all about the transaction, for a month before I commenced this suit Duncan came to my gate and I said to him, 'Wes. has not fixed up my

papers yet. I have got some more cotton which I expect to let him have when I get my papers,' and showed him my receipts. He said, 'You have no idea Wes. will cheat you ? he has been sick and not able to attend to business.' I replied, 'No; but I want the matter fixed up.' That was at least a month before the suit was commenced, and he said nothing about buying the land.'"

Goodman corroborates Mims as to making the title when the $285 was paid. "Chandler told me in the fall of 1881, if Mims would pay him three bales of cotton, he would make him the title and take a mortgage for the balance. After Mims delivered him the cotton, he said he saw no chance for him to pay, and he would not make the title. He did say something about making title to his aunt if he could get his money. That is the first time I heard about his aunt, a year after the sale to Mims. Chandler told me of the bargain with Mims before the $285 was paid."

J. A. Lemon testifies: "Chandler told me, 'I can do nothing with uncle Tim.' He said, 'Go and tell him if he will bring me three bales of cotton, I will make him the title.' I did tell him, Mims did bring the cotton, and Chandler said he could not make the title then, but would get Dr. Mayes to draw it and would send it. He gave him a receipt. Chandler said he believed he would make the title to one of the boys. That was the first time I heard about making to any one else."

E. C. Mims testified: "Was at Chandler's just before Christmas, 1880, when bargain was made. Frierson made the title to Chandler. When Chandler made title to Goodman, father paid him $285, and Chandler gave a receipt, saying he had not time to make title then, but he would make them out and father could come and get them."

This was the plaintiff's case. When he closed, Mr. Earle moved to dismiss the complaint. I suggested to Mr. Earle to reserve the question and to go into his defence. He insisted on his motion and it was refused. The defendants then went into their defence, and proved by C. J. Wilson that he was present in November, 1881, when Mims told Chandler he could not pay for the land, that he had tried to borrow the money, and that Chandler would have to take it back. It was the year of the drought.

He asked Chandler if he would rent? Chandler said he would see him. In November, 1881, Lemon says Mims told Chandler he could not meet payments on land—was humming and hawing about renting. Nothing said about Mims's wife.

T. D. Chandler produced a title from his brother, dated December 13, 1881, to the land in question, for $500. Mims told my brother he could not make · payments, and spoke about renting. He says he does not know what land is worth—at least $500. He bought it for $500, paid no money, that he had money in his brother's hands, which he had lent him from time to time; that his brother offered to take $500 for the land—what he owed him. He said Mims did show him the receipts at the gate, and he did tell him his brother would not cheat him—not to be uneasy. He said he heard nothing about going to law. His deed is dated December 13, 1881, recorded January 21, 1882; the complaint is dated December 14, 1881. The conversation at the time Mims showed him his receipts at his gate was before that about not making payments.

D. W. Chandler then testified, that on December 21, 1880, he bought the land from Frierson for $900, provided Mims paid his rent to date. "The deed was for $1,200, which I paid, except $285, which Mims paid on his rent to me, and I receipted for. One hundred acres was sold to Goodman for $500. Mims was in possession as a tenant of Frierson, and had five bales of cotton destrained for rent. I paid Frierson thirty days after. Mims has not paid me a dollar. All of his payments have been made on account of his advances. I did promise to settle the land on my aunt and her children when she paid me $400. Had no conversation with her—the agreement was with Mims. The $285 receipt was the money he paid for Frierson's rent, the balance in full. The other receipts were on his accounts. I had no connection with the Frierson agreement. Am willing to convey land to my aunt and her children when I am paid $400 at 12 per centum interest. Not a dollar has been paid on it. Mims said he was satisfied, and agreed to pay three bales of cotton. I owed my brother $585, and was to pay 12 per centum interest. Had no idea of this suit. I may have had the conversations referred to, but they were on the agreement to make titles to

Mims's wife. I did tell Goodman about September 10 to tell Mims if he would pay three bales on his account, I would take a mortgage on the land and wait a year, if I could possibly arrange my business; if not, I would notify him. Sent for Mims in November, told him I must have the $400 for the land. Went into a settlement—he expressed himself satisfied, and asked for an extension of credit. Told him I was compelled to have money. He said, 'I will give it up,' and asked if he could rent. Replied, 'I do not know ; think I will be forced to sell.' He agreed to it. Sent for him in December, told him I would rent for three bales. He expressed thanks."

On the cross-examination, this witness read from a paper which he said he had made night before the last, "Frierson came with Mims when land was sold. Mims sold the cotton and brought the money to the store. Goodman is mistaken when he says I promised to make title to Mims. I did not send the message about three bales to be credited on the land. You (Mr. Lee) told me about this suit last November ; I asked you to wait, as I thought I would settle with Mims. Supposed I had, and was surprised I was sued."

The plaintiff Mims was then recalled, who said, "Not a word was said about my wife on the day of the agreement to the last payment, and when I offered to pay the balance which he refused, Chandler said, 'If you do not pay me all the accounts you owe me, you shall not have the land.' I did say, 'I do not see how I can raise all the money.' I never offered to rent, but said, 'I can't tell you now, and want to see my attorney.' "

This, in substance, is the whole case. I do not think I have omitted a material fact or statement. After seeing and hearing the witnesses, a careful review of the testimony, and full consideration of the earnest and able arguments submitted on both sides, I do not think there can be the slightest doubt in any candid mind that Mims, Goodman, and Frierson have given the exact truth in relation to this transaction. Whether Chandler had a sinister purpose in assisting his uncle, Mims, to make the purchase from Frierson, I am not certain, but am inclined to think not. That he knew all the particulars of the bargain and sale, I feel assured. He was prosperous then, as shown by his

ability to raise the $900 to complete the cash payment; hence, he promptly gave his receipt for $285, "to be placed on land papers." What can he mean by that? Can there be any other solution than that the agreement as stated by Mims was the real transaction, and the payment in part performance? This view is strengthened by the fact, about which there can be no doubt, that at the very time of receiving the money and giving the receipt, he promised to have the papers prepared and sent to Mims. Chandler himself supports this view when he says this rent was to be a part of the purchase money.

To my view, after the payment of the $285 of the purchase money, the reception of the receipt for land papers, and remaining in possession, that Mims was Frierson's tenant is extravagant. How could he be? Frierson had conveyed the land to Chandler, who had paid $285 of Mims's money as part of the purchase money, made title to Goodman, given his receipt to Mims on land papers, and promised to execute and send the title in a few days. To hold now that he was Frierson's tenant, and not in under a contract of sale, is such a tax on credulity, that I cannot entertain it for a moment.

But, independently of this, if Chandler did not regard his uncle, Mims, as the purchaser of that 65 acres, why did he permit him to improve it? He knew he was a poor man, that he was anxious to secure a home for his family, and yet he never uttered a word of warning, to say, your labor may be in vain! It is true, to cut down, ditch, and drain ten acres is no great undertaking for a landed proprietor of means, but when a poor man, who cannot afford to buy more than 65 acres, goes on that small tract, thinking he has bought his home, and with his boy, a mere youth, with their own hands cut down timber, dig ditches, drain wet places, and bring it into cultivation, improving the healthfulness of the residence, it is a big job, although there be but ten acres redeemed. Chandler saw his uncle and cousin doing this work. Can there be a plausible reason for permitting them to waste their labor, if he claimed the land?

That there was an agreement to purchase by Mims, at the date of the purchase, is beyond doubt according to Chandler's own statement. He does not deny the conversations referred to as to

the title, but says there was an agreement to make title to Mims's wife and children. Now, if this be so, when was the agreement made? It must have been at the time of the purchase, and the $300 must have been a part of the purchase money, which was paid by Mims, for Chandler says, "I did promise to settle land on my aunt and her children when she paid me $400, at 12 per cent. per annum interest." What does that mean? The contract price was $700, Mims paid $300, balance $400. This confirms the whole transaction, as related by Mims and the other witnesses for the plaintiff. It is clear, however, to my mind, this settlement on his aunt is an afterthought. Chandler himself says, "She was not present; I had no conversation with her;" and all the witnesses swear that nothing was said about his aunt until a year or more after the contract to purchase.

I do not hesitate in my conclusions that there was part payment, possession under the purchase, a promise to make title, and that this is an effort to apply payments on the land to an antecedent debt against the express instruction of the debtor.

I am not so certain but that Chandler may be regarded in the light of a trustee. He had nothing to do with the contract to purchase from Frierson, in its inception. That was entirely between Mims and Frierson, for Goodman says, "I bought from Mims; went in with Mims, and thought Frierson was to make the title." After the contract to purchase for $1,200 had been completed between Frierson and Mims, Chandler came in and agreed with Mims, if he would raise $300, or as near that amount as he could, he would raise the other $900, take the title in his own name, make title to Mims and Goodman, and give them time to pay, the debt being secured by bond and mortgage of the land each was to get. In pursuance of this agreement, he did make title to Goodman and took his bond and mortgage, gave a memorandum in writing to Mims for his cash payment, $285, and promised to prepare the papers another day, it then being too late.

Is that not only a compliance with the statute of frauds, writing and part payment, but does it not place Chandler in the position of a trustee, holding for the benefit of Mims, when he paid the balance of the purchase money? Can one

occupying such a relation to an innocent purchaser invoke the protection of the statute? Will he be permitted to practise such a fraud upon the trusting relative, whose money he has used, and who has diligently complied with every part of his engagement? I think not.

This whole transaction has, to my mind, very much the appearance of a contrivance on the part of Chandler, finding that he was embarrassed, and that the purchase of the land was a good speculation, to turn the advantage to his own account; or, as if he had intended from the first to entrap Mims into the payment of the $300, and collect, under the pretence of procuring for his wife and children, his preëxisting accounts for advances for which he had no security, and against the express instructions of his uncle how to apply the payments. The equity side of this court cannot lend its aid to such a contrivance. Daniel Wesley Chandler must perform his contract, and make title to his uncle, Timothy Mims.

Very little need be said as to the conveyance from Daniel W. Chandler. A more transparent fraud I have never seen. Inadequate price; no money paid; title made the day before the date of the complaint; knowledge of the suit; inspection of Mims's receipts; indignant exclamation to Mims, "Do you think my brother would cheat you?" The whole thing is too thin to waste time and words. The deed must be set aside as fraudulent and void.

1. It is ordered, adjudged, and decreed that Daniel W. Chandler do perform his contract. 2. That the master do make title to Timothy Mims of the land described in the complaint on receiving from him the sum of $296.76, with interest from February 16, 1883. That the costs be paid out of the money paid by Mims, and the balance to T. Duncan Chandler.

As D. W. Chandler says the land was purchased for the benefit of his aunt, Mrs. Mims, and her children, and that his brother is now ready to carry out that arrangement, it is finally ordered that the master may make title to Mrs. Mims, on such terms and conditions as may be agreeable to her husband, Timothy Mims, the plaintiff in this action.

The testimony of the plaintiff and of each of his witnesses concerning the agreement for the sale of land was objected to by the defendants upon the ground that such an agreement could not be proved by parol. These objections were overruled, and the defendants excepted. At the conclusion of plaintiff's testimony, the defendants moved that the complaint be dismissed, upon the ground that the alleged agreement was within the statute of frauds. This motion was refused, and defendants excepted. The exceptions to the decree appear in the opinion.

*Messrs. Earle & Beard,* for appellants.

*Messrs. Moïses & Lee,* contra.

October 6, 1884. The opinion of the court was delivered by MR. JUSTICE MCGOWAN. This was an action, in the nature of a bill in equity, to set aside the conveyance of a certain tract of land, alleged to be fraudulent, and to enforce a parol agreement as to the same. The defence denied the existence of the alleged parol agreement, and interposed the statute of frauds to exclude all evidence of such agreement. The case came on to be heard by Judge Aldrich, who admitted the testimony, the substance of which is fully stated in the decree of the judge, with an abstract of the testimony of the different witnesses. It will therefore be unnecessary to restate the testimony, or to do more than give such a general outline of it as to show its character and make the points intelligible. [Here follows a statement of the testimony of Mims and Goodman as given in the Circuit decree.] There was other testimony, but none, as we think, very materially changing the substance of this statement.

The Circuit judge decreed that the conveyance of the land from D. W. Chandler to his brother, Duncan, should be set aside as fraudulent; that D. W. Chandler should execute the trust assumed by him to convey the land to Mims, and that the master should make title to the said Mims, on his paying the balance of the purchase money, viz., $296.76, with interest thereon from February 16, 1883, the costs to be paid out of the money thus to be paid; and the following was added: "As D. W. Chandler

says the land was purchased for the benefit of his aunt, Mrs. Mims, and her children, and that his brother is now ready to carry out that arrangement, it is finally ordered that the master may make title to Mrs. Mims on such terms and conditions as may be agreeable to her husband, Timothy Mims, the plaintiff in this action."

The defendants appeal to this court upon the following grounds :

1. "Because the agreement alleged in this case could not be proved by parol.

2. "Because his honor erred in holding that the alleged agreement was not within the statute of frauds.

3. "Because the receipt for '$285 to be placed on land papers' is not such a memorandum as the statute requires.

4. "Because Mims had been in possession under Chandler's grantor, and the retention by him of a ·pre-existing possession does not take the case out of the statute.

5. "Because the payment of a part, or even the whole, of the purchase money is not sufficient to take the case out of the statute.

6. "Because the circumstances as proved do not satisfy the statute.

7. "Because his honor erred in holding that the payments made by Mims should be credited upon the alleged account for the purchase of the land and not upon his account for merchandise sold to him by Chandler.

8. "Because if an agreement for the sale of the land ever existed between the parties, Mims released all his rights thereunder before the conveyance of said land to T. Duncan Chandler was executed.

9. "Because his honor erred in holding that the plaintiff was not estopped from setting up the alleged agreement against T. Duncan Chandler.

10. "Because, under the circumstances as proved, T. Duncan Chandler has at least the right to be reimbursed the amount paid by him for the land.

11. "Because his honor erred in his conclusions of fact and of law."

We incline to think that the second view of the Circuit judge was the correct one; that the facts made out a case of trust

resulting to Mims, which was susceptible of proof by parol. *Billings* v. *Clinton*, 6 *S. C.*, 102. Mims made the contract of purchase from Frierson, not from Chandler—who did not appear in the business at all until the purchase money was to be paid. It is true that he then delivered the money to Frierson—not as a purchaser for himself, but for Mims, who furnished $285 of the money so paid. This payment, through Chandler, raised a resulting trust in favor of Mims, certainly to the extent of the payment, if it did not give color and character to the whole transaction. It was clearly proved that actual payment of a definite proportion of the purchase money was made by Mims, the *cestui que trust*, at the time of the purchase. *Ex parte Trenholm*, 19 *S. C.*, 127.

But as Mims did not pay in cash the remainder of the purchase money ($415), which was advanced for him by Chandler when he took the title, we will assume that Chandler really occupied the relation of vendor to Mims, and we think that, even upon that assumption, the result must be the same. The statute of frauds, embodied in section 2019 of the general statutes, does provide "that no action shall be brought upon any contract or sale of lands, tenements, or hereditaments, or any right in or concerning them * * * unless the agreement upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, signed by the parties to be charged therewith," &c. The agreement sought to be enforced by the plaintiff—that Chandler held the legal title of the land only as a security for the purchase money advanced by him—was not in writing. At the time Chandler took the title, he gave to Mims a receipt in writing for $285, "to be placed on land papers," and we have no doubt that receipt had reference to the land in question, and was an acknowledgment of part payment of the purchase money. We do not, however, think that the receipt expressed the agreement alleged to exist, or was such "a memorandum thereof" as the statute requires. It did not contain the particulars of the agreement in such definite and unambiguous terms, as has been held to be necessary under the statute. *Church of Advent* v. *Farrow*, 7 *Rich. Eq.*, 378.

But while the receipt was not such a memorandum of the

agreement as to take it out of the statute, it is well settled that
"the Court of Equity will enforce specific performance of a con-
tract within the statute when the parol agreement has been partly
carried into execution. The distinct ground upon which Courts
of Equity interpose in cases of this sort is that otherwise one
party would be enabled to practise a fraud upon the other."
2 *Story Eq.*, § 759; 2 *Pom. Eq. Jur.*, 423. Was there such
part performance in this case as to take it out of the statute?
We think there was. The Circuit judge found that the payment
by Mims of the $285 at the time the arrangement was made, for
which a receipt was given, stating that it was "to be placed on
land papers," was in part payment of the purchase money, and
in this finding we concur. That payment could not (as claimed
by Chandler) have been a payment for the rent due Frierson, for
the price of the land ($1,200) had absorbed and extinguished the
rent to Frierson as such. Nor could it have been for rent due to
Chandler himself, for there is not an intimation in the case that
at that time Mims owed Chandler any rent.

This and the other payments to Chandler, indicated by the
receipts "on account," were payments on the land purchase as
directed by Mims; but, according to the authorities, these pay-
ments on the purchase were not alone sufficient to take the case
out of the statute. It seems that the payment of the whole pur-
chase money would not of itself suffice for that purpose, but it is
a circumstance which, in connection with others, may be consid-
ered. *Smith* v. *Smith*, 1 *Rich. Eq.*, 130. According to the
authorities, it seems that putting the purchaser into possession is
to be considered as stronger evidence of part performance than
mere payment of the purchase money; for the reason that such
act would be a fraud upon the purchaser unless the agreement
should be fully performed. "Especially will it be held to do so
when the party let into the possession has expended money in
building, or repairs, or other improvements; for under such cir-
cumstances, if the parol contract were to be deemed a nullity, he
would be liable to be treated as a trespasser; and the expendi-
ture would not only operate to his prejudice, but be the direct
result of a fraud practised upon him." 2 *Story Eq.*, § 763.

To have such effect, of course *the possession* must not be ob-

tained wrongfully or independent of the agreement, but by virtue of it and held under it. In this case it was contended that the possession of Mims, being obtained originally as the tenant of Frierson, and Mims never having gone out as tenant and reëntered as purchaser, must still be considered as possession under Frierson; that his possession from December, 1880, when the purchase was made, until December, 1881, when the action was brought, continued to be his old possession of tenant, and not a new possession as purchaser. We cannot adopt this view, which is contradicted by every fact in the case, as well as by the declarations of Chandler himself. "If the possession may be referred to an independent title, *e. g.*, where it is held under a pre-existing tenancy, the same principle does not apply, unless the parties so conduct themselves as to show that they are acting under the contract," &c. *Adams Eq.*, 212.

The Circuit judge found as matter of fact, and we concur with him, that on December 21, 1880, Mims ceased to be the tenant of Frierson, and was let into a new possession as purchaser. Up to that time, as tenant of Frierson, he was in possession of the whole land; afterwards he was only in possession of the parcel (sixty-five acres) purchased by him. On the day indicated, Frierson conveyed all his interest in the land, and of course Mims's tenancy to him then ceased, and there is no evidence that on that occasion, or any other, he took a new lease from Chandler or any one else. On the contrary, he then commenced a new possession of the parcel purchased by him, in accordance with the direction of Chandler himself, who said, "I can't draw your papers, it is late now, but I will have them fixed up by Dr. Mayes and send them to you. Go home, go to work, and make yourself easy."

He was in this possession as purchaser for a year at least, and during that time made improvements on the land without dissent or warning. It is true the improvements were not extensive. It may be considered a small matter to clear, drain, and ditch ten acres of land, but it is not probable that as mere tenant he would have done so much, and the improvements do not seem to be out of proportion to the means of the parties. This possession by the direction of Chandler, with the improvements made, consid-

ered in connection with the other circumstances, and particularly the payments on the purchase money, were sufficient to take the case out of the statute, and the parol proof established the contract alleged by the plaintiff. We agree with the Circuit judge that the plaintiff is entitled to have the land conveyed to him upon the payment of the balance due on the advances made by Chandler with interest.

But we do not concur in so much of the decree as authorized the master to make the title to Mrs. Mims. At the time of the agreement nothing was said about conveying the land to Mrs. Mims. What was afterwards said by Chandler was *ex parte* and without consideration. Timothy Mims made the contract, also the payments in part, and he will be required to pay the balance due. The title should be made to Timothy Mims himself.

In reference to the deed of the land from D. W. Chandler to his brother, Duncan, the latter testified that "he does not know what the land is worth; at least $500; he bought it for that price; paid no money; had money in his brother's hands, which he had lent him from time to time; that his brother agreed to take $500 for the land, what he owed him." He said Mims did have the receipts at the gate, and he did tell him his brother would not cheat him, &c. The deed bore date December 13, 1881, one day before the action was brought. At that time, T. Duncan Chandler knew all the facts as to the manner in which his brother held title to the land. He paid nothing for it, and we agree with the Circuit Judge that the deed should be set aside as fraudulent and void.

The judgment of this court is that the judgment of the Circuit Court be modified so that the title to the land described shall be made to Timothy Mims, and in all other respects affirmed.