# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Stevens and Wilkinson of South Carolina, Inc., Gary
Realty Company, Inc., Garfield Traub Development,
LLC, and Turner Construction Company, Plaintiffs,

Of Whom Stevens & Wilkinson of South Carolina, Inc.,
Gary Realty Company, Inc., and Garfield Traub
Development, LLC, are Respondents,

v.

City of Columbia, Paul C. "Bo" Aughtry III,
Windsor/Aughtry Co., Inc., Vista Hotel Partners, LLC,
and Hilton Hotels Corporation, Defendants,

Of Whom the City of Columbia, is Petitioner.

Appellate Case No. 2012-208490

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Richland County
The Honorable George C. James, Jr., Circuit Court Judge

---

Opinion No. 27434
Heard January 21, 2014 – Filed August 20, 2014

---

## REVERSED

---

Michael W. Tighe, D. Reece Williams, III, Richard C.

Detwiler, and Kathleen M. McDaniel, all of Callison Tighe & Robinson, LLC, of Columbia, for Petitioner.

Richard A. Harpootlian and Graham L. Newman, both of Richard A. Harpootlian, PA, of Columbia; Kenneth M. Suggs and Francis M. Hinson, IV, both of Janet Jenner & Suggs, LLC, of Columbia, for Respondents.

---

**JUSTICE HEARN:** The respondents, two developers and an architectural firm, entered into a Memorandum of Understanding (MOU) with the City of Columbia as part of a larger project team to develop a publicly-funded hotel for the Columbia Metropolitan Convention Center. The City eventually abandoned its plan under the MOU, and the respondents brought suit on several causes of action including breach of contract and equitable relief. The City moved for summary judgment arguing the MOU was not a contract and therefore the contract claims failed. The circuit court agreed and, rejecting the equitable claims as well, granted summary judgment in favor of the City. The respondents appealed and the court of appeals affirmed in part and reversed in part. *Stevens & Wilkinson of South Carolina, Inc. v. City of Columbia*, 396 S.C. 338, 721 S.E.2d 455 (Ct. App. 2011). We reverse.

## FACTUAL/PROCEDURAL BACKGROUND

In January of 2001, the City, seeking a team to develop a publicly-funded, full-service hotel adjacent to the convention center, issued a request for qualifications. The City settled on a project team in December of 2002 that consisted of the architectural firm of Stevens & Wilkinson of South Carolina, Inc. (S&W); Turner Construction Company; Hilton Hotels Corporation; the underwriter Salomon Smith Barney, Inc.; and three developers—Edens & Avant Real Estate Services LLC; Garfield Traub Development, LLC; and Gary Realty Company Inc.

In April of 2003, the City and the project team members entered into the MOU. The MOU documented "the understandings reached with respect to the financing, development and operation of the Hotel." It contemplated multiple future agreements to fully define the duties of the parties—the Development Management Agreement, the Design/Build Agreement, the Qualified Management Agreement, and the HQ Hotel Room Block Commitment, a joint use agreement for parking, and a bond financing agreement. At the outset, the MOU provided:

This MOU reflects the intent to proceed in good faith to execute definitive written agreements with respect to the business terms and conditions herein contained. Notwithstanding anything herein to the contrary, if the City determines that is it not feasible to proceed with the Hotel project it shall have no liability under this MOU.

Additionally, the MOU illustrated the roles of the signatories. The City was to acquire the land and prepare it for construction, establish a non-profit corporation to own the Hotel and issue bonds for financing, and "retain [Salomon] and legal counsel to structure and issue approximately $60 million in tax exempt hotel revenue bonds." Under the MOU, the "Developer"—Edens, Garfield, and Gary— "will coordinate design, development, construction and delivery of Hotel in accordance with the terms of the Development Management Agreement to be finalized between the City or [non-profit corporation]." S&W, the architect, "shall develop and implement a design review process."

The MOU also addressed payment of the project team, stating:

The Project Team will be responsible for the costs incurred prior to closing the financing. . . . If Hotel financing fails to close as a result of the City not meeting its obligations outlined in the Development Management Agreement, . . . the City will reimburse the Project Team for actual, documented costs incurred to that point up to an amount to be agreed upon.

Additionally, the MOU clarified any payment to S&W, Turner, or Salomon was contingent upon Salomon successfully closing the bond financing. The MOU also stated: "All studies, tests, plans and the like prepared or obtained by the Project Team will be assigned to and become property of the City."

The parties began negotiating the contracts required under the MOU during the course of the next year. S&W completed its initial design thereby allowing Turner to determine the guaranteed maximum price of the project as envisioned under the MOU, and that price was approved by the City in July 2003. S&W informed the City it would cease design work for the ninety days remaining until the bond financing closed unless the City agreed to compensate it for work performed in the interim. S&W submitted an estimate of $650,000 to continue working until the anticipated bond closing and $75,000 per week after that. On July 30, 2003, the city council voted to approve "$650,000 for interim architectural design."

Over the course of the negotiations, the bond issuance required to fund the project rose from the $60 million estimated in the MOU to $71 million by February 2004. Nevertheless, the non-profit organization accepted the financing plan for the $71 million and set the bond closing date as April 1, 2004. However, by mid-March the estimate had climbed to above $72 million. A little over a week after receiving this most recent financial report, the City issued a new request for proposals to develop a privately-funded hotel for the convention center. Ultimately Windsor/Aughtry Co., Inc. was chosen as the developer and it successfully constructed the Hilton.

S&W sued the City for breach of contract based on the MOU and the July 30 agreement, and on the equitable grounds of quantum meruit and estoppel.[1] Gary and Garfield also sued the City for quantum meruit and breach of the duty of good faith, later adding a breach of contract claim. The City moved for summary judgment arguing the MOU was not a contract, it retained no benefit from the work of the project team, and the MOU contained no promise to pay S&W.

In a consolidated order, the circuit court granted summary judgment in favor of the City on all claims.[2] Specifically, the court found the MOU was not a binding contract, and instead was a nonbinding agreement to agree in the future. It further held that the respondents failed to present any evidence they had conferred a benefit on the City, and that S&W failed to prove a promise to pay existed within the MOU or that reliance on the MOU for payment was reasonable.

S&W appealed the issue of whether the MOU was a contract and the issue of promissory estoppel. Gary and Garfield appealed the issue of whether the MOU was a contract and their claim for quantum meruit. The court of appeals affirmed in part and reversed in part. *Stevens*, 396 S.C. at 340, 338 S.E.2d at 456. The court affirmed the grant of summary judgment on S&W's claim for promissory

---

[1] S&W moved for partial summary judgment arguing the July 30 agreement created a contract between it and the City. That case is the subject of our opinion in *Stevens & Wilkinson of South Carolina, Inc. v. City of Columbia*, Op. No. 27433 (S.C. Sup. Ct. filed August 20, 2014).

[2] Turner Construction also filed suit against the City for breach of contract, quantum meruit, contract implied by law, and breach of the duty of good faith and fair dealing. Turner's case was consolidated with the respondents' cases and it simply joined the arguments of the respondents at the hearing. It did not file an appeal.

estoppel.  *Id.*  It held the circuit court erred in granting summary judgment on the grounds the MOU is not a contract, finding there was conflicting evidence as to whether the parties intended to create a binding contract, and therefore reversed and remanded on that issue.  *Id.* at 344, 721 S.E.2d at 458.  The court of appeals also reversed the grant of summary judgment on Gary and Garfield's quantum meruit claims, stating it could not rule as a matter of law the City retained no benefit.  *Id.* at 347, 721 S.E.2d at 460.  The Court granted certiorari to review the court of appeals' opinion.

## ISSUES PRESENTED

I.    Did the court of appeals err in finding a genuine issue of material fact existed as to whether the MOU is a binding contract?

II.   Did the court of appeals err in reversing the circuit court's grant of summary judgment in favor of the City on Gary and Garfield's claim for quantum meruit?

## STANDARD OF REVIEW

"The purpose of summary judgment is to expedite disposition of cases which do not require the services of a fact finder."  *Dawkins v. Fields*, 354 S.C. 58, 69, 580 S.E.2d 433, 438 (2003).  On review from a grant of summary judgment, the Court applies the same standard applied by the circuit court pursuant to Rule 56(c), SCRCP.  *Knight v. Austin*, 396 S.C. 518, 521–22, 722 S.E.2d 802, 804 (2012).  Accordingly, summary judgment is appropriate when the pleadings, depositions, affidavits, and discovery prove there is no genuine issue of material fact and the movant must prevail as a matter of law.  *Id.*  In reviewing the evidence, all inferences must be viewed in the light most favorable to the non-moving party.  *Id.*

## LAW/ANALYSIS

I.    MEMORANDUM OF UNDERSTANDING

A. Extrinsic Evidence

Initially, the City argues the court of appeals erred in looking outside the four corners of the MOU to determine whether it constituted a binding contract. Because we find the MOU is unambiguously not an enforceable contract, we agree.

"Where an agreement is clear on its face and unambiguous, the court's only function is to interpret its lawful meaning and the intent of the parties as found within the agreement." *Miles v. Miles*, 393 S.C. 111, 117, 711 S.E.2d 880, 883 (2011) (quotation omitted). Where the contract language is plain and capable of legal construction, that language alone determines the instrument's force and effect. *Jordan v. Sec. Grp., Inc.*, 311 S.C. 227, 230, 428 S.E.2d 705, 707 (1993).

The respondents argue the MOU is a complete contract, lacking no material terms and the MOU itself claims it fully "identifies the understandings of the parties." Although the majority of case law addressing extrinsic evidence pertains to contract *construction* and not the *existence* of a contract, the inquiry in both instances involves giving force and effect to the intent of the parties, and we discern no reason for different rules of analysis.[3] As this Court has stated:

> When a writing, upon its face, imports to be a complete expression of the whole agreement, and contains thereon all that is necessary to constitute a contract, it is presumed that the parties have

---

[3] The respondents rely heavily on *Conner v. City of Forest Acres*, 363 S.C. 460, 611 S.E.2d 905 (2005), for the proposition that "when the existence of a contract is disputed or its terms are ambiguous, evidence that a party complied with the terms of the alleged contract or acted in conformity therewith is relevant and admissible on the issues of the contract's existence, the meaning of its terms, and whether the contract was breached." *Id.* at 473, 611 S.E.2d at 912. The facts of *Conner* are inapposite. *Conner* was a so-called "employee handbook claim" which dealt with the termination of an employee and posed the question of whether evidence of the employer's grievance procedures was admissible in determining whether the employee handbook provisions constituted contractual terms. *Id.* at 473, 611 S.E.2d at 912. The employee contended the handbook *modified* the terms of her existing at-will employment contract, and therefore the Court held evidence that the employer followed the procedures within the handbook was probative of the intent to treat the handbook as contractual. *Id.* at 473, 611 S.E.2d at 911. Therefore, *Conner* addressed contract modification, not whether a single document constituted a contract.

introduced into it every material item and term, and parol evidence is not admissible to add another term to the agreement, although the writing contains nothing on the particular item to which the parol evidence is directed.

*Gladden v. Keistler*, 141 S.C. 524, 542, 140 S.E. 161, 167 (1927). We accordingly hold that where the language of a purported contract clearly expresses the intent to be non-binding, the analysis is limited to the four corners of the document.[4]

## B. Existence of Enforceable Contract

The City also argues the court of appeals erred in holding a genuine issue of material fact exists as to whether the MOU is a contract. We agree.

Although the existence of a contract is ordinarily a question of fact for the jury, where the undisputed facts do not establish a contract, the question becomes one of law. *Capital City Garage & Tire Co. v. Elec. Storage Battery Co.*, 113 S.C. 352, 362, 101 S.E. 838, 841 (1920). A valid and enforceable contract requires a meeting of the minds between the parties with regard to *all* essential and material terms of the agreement. *Patricia Grand Hotel, LLC v. MacGuire Enters*, 372 S.C. 634, 638, 643 S.E.2d 692, 694 (Ct. App. 2007). Thus, for a contract to be binding, material terms cannot be left for future agreement. *Aperm of S.C. v. Roof*, 290 S.C. 442, 447, 351 S.E.2d 171, 173 (Ct. App. 1986). "In a contract for services two essential terms are the scope of the work to be performed and the amount of compensation." *W.E. Gilbert & Assocs. v. S.C. Nat. Bank*, 285 S.C. 421, 423, 330 S.E.2d 307, 309 (Ct. App. 1985).

In reversing the circuit court, the court of appeals focused on the intent of the parties, noting that there were mutual promises within the MOU and some boilerplate contractual language that at least create a genuine issue of material fact as to whether the parties intended the MOU to be a contract. However, regardless

---

[4] The dissent contends our holding in some way does violence to the parol evidence rule as well as the statute of frauds. We disagree. Of course the parol evidence rule involves actual contracts, not purported ones such as the written agreement here. We make only the unremarkable assertion that where a written document, by its own terms, unambiguously indicates it is meant to be non-binding, we will not allow the introduction of extrinsic evidence in an attempt to contradict that clear expression.

of intent, an agreement which leaves open material terms is unenforceable. *Aperm*, 290 S.C. at 447, 351 S.E.2d at 173; 1 Corbin on Contracts § 2.8 (Rev. ed. 1993) ("Even if an intention to be bound is manifested by both parties, too much indefiniteness may invalidate the agreement, because of the difficulty of administering the agreement."); 1 Corbin on Contracts § 4.1 ("A court cannot enforce a contract unless it can determine what it is. It is not enough that the parties think that they have made a contract. They must have expressed their intentions in a manner that is capable of being understood.").

Examining the plain language of the document, we find there was no meeting of the minds as to all material terms and the MOU is therefore unenforceable. It is only an agreement to agree in the future outlining the framework under which the parties would proceed to negotiate the development of the hotel. By its own terms, it "reflects the intent to proceed in good faith *to execute definitive written agreements* with respect to the business terms and conditions herein contained." (emphasis added). The MOU expressly states the intention to enter into future "definitive" agreements, such as the Development Management Agreement, the Design/Build Agreement, the Qualified Management Agreement, and the HQ Hotel Room Block Commitment. Thus, the clear language of the MOU indicates the parties consciously agreed to finalize binding agreements at some point in the future.

The respondents counter that the MOU provides clear guidelines for the subsequent agreement and therefore the MOU is enforceable under *Aperm*. In that case, Aperm of South Carolina, the owner of a roof coating composition and application method entered into an option agreement with Roof and granted him exclusive license to research, develop, manufacture and sell its invention. *Aperm*, 290 S.C. at 444, 351 S.E.2d at 172. The agreement allowed Roof to terminate the contract upon written notice by August 1, otherwise the agreement would become fixed. *Id.* Under the agreement, Roof was also required to present Aperm with a comprehensive manufacturing and marketing program which conformed to the agreement's guidelines. *Id.*

> The program was required to include minimum royalty payments of $4,800.00 per month during the period August 1, 1981 to July 31, 1982, and increased monthly royalty payments thereafter. The marketing and manufacturing program was subject to Aperm's approval, but disapproval had to be reasonably related to the guidelines set out. The contract stated specifically that if the program provided for the minimum royalties, then objections to the program by

Aperm would be subject to arbitration, but if the program failed to provide for minimum royalties, Aperm could cancel the contract.

*Id.* at 444–45, 351 S.E.2d at 172. Roof exercised his rights under the agreement to proceed therewith, but almost immediately defaulted for failing to pay the required royalties to Aperm. *Id.* at 445, 351 S.E.2d at 172. Aperm sued Roof for breach of contract and the trial court awarded damages pursuant to the licensing agreement. *Id.* at 446, 351 S.E.2d at 173. Roof appealed, arguing the licensing agreement was merely an agreement to enter into a contract after August 1 and was therefore unenforceable. *Id.* at 446–47, 352 S.E.2d at 173. The court of appeals disagreed, finding sufficient guidelines for drafting a subsequent manufacture and marketing agreement within the licensing agreement to enforce it. *Id.* at 447, 352 S.E.2d at 174. The court stated that the *sine qua non* of the manufacture and marketing program was the payment of minimum royalties, noting Aperm agreed to arbitrate the other terms. *Id.*

We find this case distinguishable from *Aperm*. In *Aperm*, the licensing agreement clearly set out the specific sum of minimum royalties and clarified that this payment was the salient factor for the program. Additionally, the *Aperm* agreement only contemplated one future document. Here, the MOU envisions the parties entering into multiple agreements and describes the intended agreements with a fluidity that renders it impossible for a court to anticipate the terms. For example, pursuant to the MOU, "The Developer will coordinate design, development, construction and delivery of the Hotel in accordance with the terms of the Development Management Agreement to be finalized between the City or [non-profit corporation] and the Developer." This leaves the scope of work to be performed by the Developer still undefined as it is as yet unclear *how* it will design, develop, and construct the hotel. We cannot see how merely stating a forthcoming document will dictate the terms of the "design, development, construction and delivery" does not plainly leave material terms undecided. The whole project *is* the design, development, construction, and delivery of the hotel.[5]

---

[5] The respondents claim the Preliminary Development Management Scope of Services which was an attachment to the MOU, could have been the final Development Management Agreement. We disagree. That document also lacks significant material terms, including any duties of the City and caps on financial liability as contemplated in the MOU.

Nor is the scope of S&W's duties clearly defined. The only description of the work S&W was to perform under the MOU is to "develop and implement a design review process" and contains no specific reference to an actual design. There are no guidelines as to what this process should look like, only that it should "provide the City, neighborhood and professional staff input into the design of the hotel." The MOU lacks any provisions on actual design duties of S&W and instead plainly envisions a subsequent contract between S&W and Turner. It is pursuant to this contract with Turner that S&W would be paid.

Furthermore, although initially the parties' compensation appears ascertainable with some certainty, calculating the amounts requires unknown numbers. For example, the Developer "is to be paid a development fee of 4.75% of the project budget," which was undetermined. S&W was to be paid by Turner "a fee of 7.25% . . . based on hard construction costs together with [Turner's] general expenses and fees." Aside from the fact Turner, and not the City, was to pay S&W, that amount was based on a sum—costs and fees determined by Turner—that was yet to be determined. Additionally, the MOU specifically states in reference to Turner and S&W that "[i]f the Underwriter does not close the financing, the City will not be responsible for reimbursing any costs incurred [unless the City breached its duties in the Development Agreement]." The MOU further clarifies that "[t]he Project Team will be responsible for the costs incurred prior to closing the financing. . . . If the Hotel financing fails to close as a result of the City not meeting its obligations outlined in the Development Agreement, . . . the City will reimburse the Project Team for actual, documented costs incurred to that point in time up to an amount to be agreed upon." Thus, any possible liability of the City for costs incurred prior to closing the financing was to be agreed upon in a future agreement—the Development Agreement. This document would illustrate the obligations of the City and create liability for any breach. Furthermore, the document would contain an agreed upon limitation on liability. It appears the parties all acknowledged the City's liability would be predicated on the Development Agreement, a forthcoming contract that was never executed.

Nevertheless, the respondents argue that focusing on the unfilled gaps of the agreement, such as the bond financing, ignores the fact that one of the duties under the MOU was to obtain the bond financing. Essentially, they argue the MOU is comprised of interdependent parts that are all promises to perform certain specified duties to develop a plan for a feasible, publicly-funded hotel. While we agree that the determination of many of the terms within the MOU necessarily depend on the

execution of other portions of the MOU, we fail to see how that changes the analysis.

> Frequently, agreements are arrived at piecemeal with different terms and items being discussed and agreed upon separately. However, as long as the parties know there is an essential term not yet agreed on, there is no contract. The preliminary agreements on specific items are mere preliminary negotiation building up the terms of the final offer that may or may not be made.

1 Corbin on Contracts § 2.8. From the plain language of the MOU, it is clear the parties knew material terms still remained to be agreed upon. They were also undoubtedly aware that payment and reimbursement was contingent upon obtaining bond financing, which never took place. The parties were in the process of negotiating a plan to develop the hotel and the MOU simply memorialized how the parties planned to proceed in those negotiations toward the execution of binding contracts.

Because the MOU is simply comprised of agreements to execute further agreements, there was no meeting of the minds on numerous material terms which had not yet been defined. Accordingly, we reverse the court of appeals and hold the MOU is unenforceable as a matter of law.

## II.    QUANTUM MERUIT

The City also argues the court of appeals erred in reversing the circuit court's grant of summary judgment finding no evidence of a benefit conferred on the City to maintain Gary and Garfield's quantum meruit claim. We agree.

Quantum meruit is an equitable doctrine which allows recovery for unjust enrichment under a quasi-contract theory. *Columbia Wholesale Co. v. Scudder May N.V.*, 312 S.C. 259, 261, 440 S.E.2d 129, 130 (1994). "The elements of a quantum meruit claim are: (1) a benefit conferred upon the defendant by the plaintiff; (2) realization of that benefit by the defendant; and (3) retention by the defendant of the benefit under conditions that make it unjust for him to retain it without paying its value." *Earthscapes Unlimited, Inc. v. Ulbrich*, 390 S.C. 609, 616–17, 703 S.E.2d 221, 225 (2010).

Gary and Garfield point to plans and drawings prepared by the project team, as well as their expertise, to argue the City retained a benefit from their services. At oral argument, they focused on the site location and orientation of the hotel that

was eventually used. Additionally, they highlight the deposition of the City's Rule 30(b)(6) representative, the assistant city manager, who admitted the City gave a rendering of the original project team's proposed hotel to Windsor/Aughtry. It is unclear what Windsor/Aughtry then did with the rendering, but the City manager noted the rendering "looks much like the building, the hotel that we presently have." Additionally, Raymond Garfield, the founding member of Garfield Traub, stated in his deposition that Gary and Garfield's work "gave [the City] the ability to distinguish the different financing types, different hotel types" and the City was "educated significantly by [Gary and Garfield and their] team in all respects."

The circuit court found this was insufficient to create a genuine issue of material fact, noting it was not enough to say the constructed building "looks like" the previous rendering, with no further detail as to specific "striking similarities." Furthermore, there was no evidence Windsor/Aughtry did anything with the plans or how that directly benefitted the City. The court also rejected the argument that the City benefitted from the project team's expertise, stating any benefit as to how these deals should be structured was conferred upon the other project members, not the City. However, the court of appeals reversed stating, "We do not believe it is possible to rule as a matter of law that the alleged benefit to the City had no value. Therefore, we reverse the circuit court's decision to grant summary judgment on this element of the quantum meruit claim." *Stevens*, 396 S.C. at 347, 721 S.E.2d at 460.

We agree with the circuit court's finding there was no genuine issue of material fact as to whether the City retained a benefit. An anecdotal visual comparison alleging the building Windsor/Aughtry constructed looks similar to the schematics for Gary and Garfield's proposed hotel and a vague assertion that Gary and Garfield imparted some knowledge to the City does not suffice to withstand the mere scintilla standard. There is no other evidence offered that Windsor/Aughtry used the plans in any way or, even if it did, how that benefitted the City. Likewise, we are unpersuaded that the City retained a benefit by learning from Gary and Garfield's expertise. To some extent any dealing with other professionals is educational, and this is certainly true in the context of business negotiations. We again, however, fail to find any intrinsic value to the City.

Moreover, even if we were to find the City received some benefit, we find no evidence any enrichment was unjust. There is no evidence Gary and Garfield

had any reason to expect the City would otherwise compensate them for any work they performed in the event the project was not completed. As the MOU makes plain, the parties were aware they were proceeding at risk until the bond financing closed.

## CONCLUSION

Accordingly, we reverse the opinion of the court of appeals and reinstate summary judgment in favor of the City on the contract claims and on Gary and Garfield's quantum meruit claim.

**TOAL, C.J., BEATTY and KITTREDGE, JJ., concur. PLEICONES, J., dissenting in a separate opinion.**

**JUSTICE PLEICONES:**  I respectfully dissent and would affirm the decision of the Court of Appeals as I agree that the circuit court erred in granting the City summary judgment on S&W's contract claim and on Gary and Garfield's quantum meruit claim.  As explained below, I strongly disagree with that portion of the majority's opinion that would extend the applicability and scope of the parol evidence rule.

The parol evidence rule is a substantive rule of law that prohibits the introduction of evidence to contradict, add to, alter, explain, or vary the terms of an unambiguous **valid written contract**.  *E.g. Garnett v. WRP Enterps., Inc*, 380 S.C. 206, 669 S.E.2d 591 (2008).  The scope of this rule is limited to evidence of understandings and negotiations that preceded the making of the **complete written agreement**, not post-formation conduct or agreements.  6 Peter Linzer, *Corbin on Contracts* § 25.2 (Joseph M. Perillo ed. 2010).

The majority would now expand the reach of the parol evidence rule in two ways.  As explained above, the predicate for the application of the parol evidence rule is a valid and complete written contract: the majority now proposes to apply the rule to an **incomplete writing**.  The majority would also expand the scope of the rule and hold not only that it bars pre-writing understandings of the parties, but all extrinsic evidence, whether ante- or post-writing.  Explaining the effect of this newly expanded rule, the majority holds that when a writing "unambiguously fails to create an enforceable agreement," the determination whether that document is a valid contract is to be made by looking only within the four corners of the [unambiguously unenforceable] document.  In other words, if parties place some part of their contract in writing, but that writing is insufficient to stand alone as a contract, then as a matter of law the parties have no contract.

This new rule unintentionally affects the statute of frauds,[6] since, for example, no longer could evidence of part performance satisfy the statute where the written memoranda did not. *E.g. Mims v. Chandler*, 21 S.C. 480(1884) (written receipt insufficient to satisfy statute but part performance allowed court to order specific performance).  Moreover this new rule fundamentally alters the law of contracts in this State. *See e.g. Gladden v. Keistler*, 141 S.C. 524, 140 S.E. 161 (1927) (while holding a receipt was a contract, opinion acknowledges parol evidence rule does not apply to incomplete written agreements).  Further, the majority purports to

---

[6] S.C. Code Ann. § 32-3-10 (2007).  *See also Corbin*, *supra* at pp. 20-22, "The Statute of Frauds Compared with the Parol Evidence Rule."

distinguish *Conner v. City of Forest Acres*, 363 S.C. 460, 611 S.E.2d 905 (2005), which reiterates and applies the here-to-fore well settled rule that evidence of conduct is admissible to decide an issue of contract formation. In the majority's view, *Conner* asked whether an employee handbook altered the employee's "at-will employment contract." As I understand *Conner*, there was no pre-handbook "at-will employment contract." Instead, the employee's at-will status resulted from South Carolina's continued recognition of the doctrine of at-will employment, that is, "employment at-will is presumed absent the creation of a specific contract of employment." *E.g., Barron v. Labor Finders of S.C.*, 393 S.C. 609, 614, 713 S.E.2d 634, 636 (2011). In my opinion, the majority errs when it holds that evidence found outside the four corners of an incomplete writing is no longer admissible to prove the existence of a contract.

I respectfully dissent and would affirm the decision of the Court of Appeals.