# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Joseph Azar, Frank J. Cumberland, Jr., and Michael A. Letts, Individually and as Class Representatives, Appellants,

v.

City of Columbia, Respondent.

Appellate Case No. 2014-000032

———————

Appeal from Richland County
J. Ernest Kinard, Jr., Circuit Court Judge
G. Thomas Cooper, Jr., Circuit Court Judge

———————

Opinion No. 27573
Heard April 7, 2015 – Filed September 9, 2015

———————

## REVERSED AND REMANDED

———————

Charles D. Lee, III, of McLaren & Lee, of Columbia, and Gene M. Connell, Jr., of Kelaher Connell & Connor, PC, of Surfside Beach, for Appellants.

M. McMullen Taylor, of Mullen Taylor LLC, of Columbia, for Respondent.

———————

**JUSTICE KITTREDGE:** The City of Columbia generates approximately $110 million in revenue from user fees each year by providing water and sewer services. For more than a decade, the City has been allocating substantial amounts of this revenue to its General Fund and for economic development purposes. Appellants

filed this action contending the City's practices violate sections 6-1-330 and 6-21-440 of the South Carolina Code. The trial court granted the City summary judgment. Because there are genuine issues of material fact as to whether the City's expenditures of water and sewer revenues were lawful, we reverse and remand. Specifically, we remand to the trial court for further proceedings to determine whether the funds transferred into the City's General Fund were properly considered "surplus revenues" under section 6-21-440 of the Revenue Bond Act[1] and could therefore be spent for unrelated purposes and whether the City's direct economic-development expenditures bore a sufficient nexus to its provision of water and sewer services such that they would be considered "related" expenditures under the terms of section 6-1-330(B) of the South Carolina Code.

# I.

The City owns and operates the state's largest water and sewer utility. The City provides water and sewer services to residents and non-residents by way of a service contract. Pursuant to the contract, the customer pays a minimum base rate plus any additional water or sewer use as measured by a meter. The rates the City charges for water and sewer services are set by ordinance. The revenue generated by the City in water and sewer fees is deposited into the Water and Sewer Enterprise Fund (Enterprise Fund).[2] Each year, the City transfers $4.5 million from the Enterprise Fund to its General Fund.

Joseph Azar, Frank Cumberland, Jr., and Michael Letts (collectively, Appellants) brought this action to challenge the City's practice of using water and sewer revenues for unrelated purposes. Specifically, Appellants sought an injunction to prevent the City from transferring revenues from the Enterprise Fund for these uses, and a refund of all such transfers from the past three years.

The parties filed cross-motions for summary judgment. Following a hearing, the trial court issued an order granting summary judgment for the City. Appellants appealed, which this Court certified pursuant to Rule 204(b), SCACR.

---

[1] S.C. Code Ann. §§ 6-21-5 to -570 (2004 & Supp. 2014).

[2] The City allocates monies from its water and sewer enterprise fund to pay for all or part of the costs of City economic-development functions, including its economic development department, economic development special projects, the office of business opportunities, and four development corporations.

## II.

Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Rule 56(c), SCRCP. *Zurich Am. Ins. Co. v. Tolbert*, 387 S.C. 280, 283, 692 S.E.2d 523, 524 (2010) ("Summary judgment should be denied where the non-moving party submits a mere scintilla of evidence.") (citing *Hancock v. Mid-South Mgmt. Co., Inc.*, 381 S.C. 326, 673 S.E.2d 801 (2009)). When reviewing a grant of summary judgment, this Court applies the same standard applied by the circuit court pursuant to Rule 56(c), SCRCP. *Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 409 S.C. 568, 576, 762 S.E.2d 696, 700 (2014).

## III.

## A.

The Legislature has directed that local governments must use revenue derived from service or user fees to pay costs related to the provision of the services for which the fee was paid:

> (A) A local governing body, by ordinance approved by a positive majority, is authorized to charge and collect a service or user fee. A local governing body must provide public notice of any new service or user fee being considered and the governing body is required to hold a public hearing on any proposed new service or user fee prior to final adoption of any new service or user fee. . . . A fee adopted or imposed by a local governing body prior to December 31, 1996, remains in force and effect until repealed by the enacting local governing body, notwithstanding the provisions of this section.

> (B) *The revenue derived from a service or user fee imposed to finance the provision of public services must be used to pay costs related to the provision of the service or program for which the fee was paid.* If the revenue generated by a fee is five percent or more of the imposing entity's prior fiscal year's total budget, the proceeds of the fee must be kept in a separate and segregated fund from the general fund of the imposing governmental entity.

S.C. Code Ann. § 6-1-330 (2004) (emphasis added).

The City admits the monies at issue fall within the definition of "service or user fee" as the term is statutorily defined.  *See* S.C. Code Ann. § 6-1-300(6) (defining a "service or user fee" as "a charge required to be paid in return for a particular government service or program made available to the payer that benefits the payer in some manner different from the members of the general public not paying the fee").  Thus, the obvious question becomes: where section 6-1-330(B) plainly states that revenues from service or user fees "*must* be used to pay costs related to the provision of the service or program for which the fee was paid," how does the City justify using service and user fee revenues for purposes unrelated to the provision of water and sewer services?

Through an incorrect interpretation of the word "imposed," the trial court accepted the City's argument and found that section 6-1-330(B) does not apply to the water and sewer fees paid by the users.  Specifically, the trial court found that because water and sewer customers must sign a contract agreeing to pay for water and sewer service, the service arrangement is therefore a voluntary one, in which the City acts in a "proprietary capacity."  Following the City's lead, the trial court then reasoned the voluntary nature of the arrangement and the City's "proprietary capacity" somehow combine to allow these revenues to escape the limitations of section 6-1-330(B) and to permit the City to spend water and sewer revenues in any manner and for any purpose the City wishes.  We reject this construction of section 6-1-330(B).  *See Catawba Indian Tribe of S.C. v. State*, 372 S.C. 519, 525–26, 642 S.E.2d 751, 754 (2007) ("The words of the statute must be given their plain and ordinary meaning without resorting to subtle or forced construction to limit or expand the statute's operation.") (citing *Hitachi Data Sys. Corp. v. Leatherman,* 309 S.C. 174, 178, 420 S.E.2d 843, 846 (1992)).

Moreover, we do not accept the unsupported premise that these contracts for water and sewer services are "freely entered into by resident and non-resident consumers."[3]  Nor is the analysis of whether section 6-1-330(B) applies impacted

---

[3] *See* International Property Maintenance Code § 505.1 (2012) ("Every sink, lavatory, bathtub or shower, drinking fountain, water closet or other plumbing fixture *shall be properly connected* to either a public water system or to an *approved* private water system.") (first emphasis added), *adopted by* City of Columbia Code § 5-151(a) (2013).  Indeed, the City's own budget director testified in her deposition that "you can't live without water and sewer" and that these

by whether the City is acting in a so-called "proprietary capacity."[4]  Rather, the plain language of section 6-1-330(B) speaks in terms of whether revenues are "derived from a service or user fee," not whether the fee is charged pursuant to contract or ordinance or whether water and sewer customers voluntarily or involuntarily accept the imposition of such fees.  Because the City has conceded that the source of the revenues is service or user fees, we find the statute requires that revenues *must* be spent on costs "related to" the City's provision of water and sewer services.  Indeed, the plain and ordinary meaning of the language in section 6-1-330(B) requires some nexus—some commonality—between the underlying purpose of the expenditure and the City's provision of water and sewer services.

In light of the proper construction of section 6-1-330, there is a genuine issue of material fact as to whether the City's transfers and expenditures were lawful.  As to the economic development expenses the City paid directly from the water and

---

services are the "basis of life."

[4] Indeed, "proprietary capacity" is essentially an accounting concept that refers to governmental activities for which "a fee is charged to external users for goods or services," thus bearing closer resemblance to private businesses in terms of funding than to general governmental activities, which are funded primarily through tax revenues.  *See* Codification of Accounting Standards and Procedures § 1300.109 (Gov'tl Accounting Standards Bd. 2014) (citing GASB Statement No. 34, ¶67 (Gov'tl Accounting Standards Bd. 1999)) (providing guidance on financial reporting for proprietary funds).  According to the relevant Generally Accepted Accounting Principles, revenues derived from "proprietary" government activities must be segregated into a distinct enterprise fund and reported separately on financial statements if state "[l]aws or regulations require that the activity's costs of providing services . . . be recovered with fees and charges, rather than with taxes or similar revenues."  *Id*. at § 1300.109(b).  With no supporting authority, the City vastly overestimates the significance of its purported "proprietary capacity" in arguing that, when a county or municipality acts in a proprietary capacity to offer services by contract to residents and non-residents, section 6-1-330 does not constrain the local government's use of such funds.  Nothing in the language of section 6-1-330(B) differentiates or depends upon whether the service or user fee revenues are deposited into a governmental fund or a proprietary or enterprise fund; rather, that statute simply speaks in terms of "revenue derived from a service or user fee imposed to finance the provision of public services."

sewer Enterprise Fund, there is a genuine issue of material fact as to whether each of these expenditures has a sufficient nexus with the provision of water and sewer services such that the requirements of section 6-1-330(B) are satisfied.[5] We acknowledge the deposition of City Manager Steven A. Gantt, in which Gantt testified that the "overriding goal" of the City's economic development expenditures was "to bring new businesses within the [C]ity limits so that they can and do indeed become water and sewer customers." However, the record also includes an April 2007 report completed at the City's request by independent consulting firm Black & Veatch, in which the consulting firm cautioned against the very practice that led to this lawsuit:

> Based on our cost causal analysis, of the Utility's 2006 budget of $94.8 million . . . approximately $7.5 million of directly funded costs should not be funded by the Utility Enterprise Fund and are more appropriately funded through the general fund budget. This includes $3.6 million for non-departmental, capital improvements, and component units (development corporations). Our analysis is not intended to suggest the activities and functions provided by these departments is not of value to the City; rather, our analysis indicates no direct cost causation or benefit could be attributed to the Utility for these services, and therefore no cost causal based justification for direct funding from the Utility was supported for purposes of this study.

Based on this conflicting evidence about whether these economic development expenditures are sufficiently "related to" the provision of water and sewer services, summary judgment was premature and further factual development is warranted upon remand to evaluate the nexus, if any, between these economic development costs and the provision of water and sewer services. *See Bell v. Progressive Direct Ins. Co.*, 407 S.C. 565, 575–76, 757 S.E.2d 399, 404 (2014) (stating "[s]ummary judgment is not appropriate where further inquiry into the facts of the case is desirable to clarify the application of the law" and "the non-moving party is only required to submit a mere scintilla of evidence in order to withstand a motion for summary judgment" (quotations and citations omitted)).

---

[5] The record reveals that since 1999, the City has budgeted more than $29 million in water and sewer funds on various economic development expenditures.

**B.**

As to the City's transfers of water and sewer fees into the General Fund, including the City's long-standing practice of annually budgeting a $4.5 million blanket transfer of water and sewer revenues into its General Fund, we similarly find a genuine issue of material fact rendered summary judgment inappropriate.[6] In this regard, the parties concede the applicability of section 6-21-440 of the Revenue Bond Act. Section 6-21-440 of the Revenue Bond Act sets forth in detail the order in which service or user fees are to be expended in paying related costs, directing that revenues must be set aside for certain purposes other than debt service and operating costs, and allows for the disposition of any surplus funds. Specifically, section 6-21-440 provides:

> Out of the revenues there shall be set aside a sum sufficient to pay the principal of and the interest upon the bonds as and when they become due and payable. . . . This fund shall be designated the "bond and interest redemption fund." Out of the revenues there also shall be set aside a sum sufficient to provide for the payment of all expenses of administration and operation and such expenses for maintenance as may be necessary to preserve the system, project or combined system in good repair and working order. This fund shall be designated the "operation and maintenance fund." . . . Out of the remaining revenues there shall be next set aside a sum sufficient to build up a reserve for depreciation of the existing system or combined system. This fund shall be designated the "depreciation fund." Out of the remaining revenues there shall be next set aside a sum sufficient to build up a reserve for improvements, betterments, and extensions to the existing system, project, or combined system, other than those necessary to maintain it in good repair and working order as herein provided. This fund shall be designated the "contingent fund." Any surplus revenues thereafter remaining shall be disposed of by the governing body of the borrower as it may determine from time to time to be for the best

---

[6] The record reveals that certain monies within the Enterprise Fund may be derived not from service and user fees, but from other revenue sources (such as unrestricted interest income). However, the City has conceded that all the funds at issue are derived from service and user fees, and therefore, this analysis necessarily assumes that all monies transferred from the Enterprise Fund are derived from service or user fees. This issue may be further explored on remand.

interest of the borrower.

S.C. Code Ann. § 6-21-440 (2004). It is only after the utility system's operating and maintenance expenses and bond principal and interest expenses have been paid and the statutorily required set-asides have been made in the depreciation and contingent funds that "[a]ny surplus revenues thereafter remaining" may be used for unrelated purposes at the local government's discretion.[7]

We find the "surplus revenues" provisions of the Revenue Bond Act can be reconciled with the requirement of section 6-1-330(B) that all service or user fees must be used to pay for "related" costs. *See Hodges v. Rainey*, 341 S.C. 79, 88, 533 S.E.2d 578, 583 (2000) ("Statutes dealing with the same subject matter must be reconciled, if possible, so as to render both operative.") (citing *Butler v. Unisun Ins.*, 323 S.C. 402, 408, 475 S.E.20 758, 761 (1996)). Specifically, we find the "surplus revenues" provision of section 6-21-440 is a limited exception to the general rule in section 6-1-330(B)—an exception that allows disposition of surplus funds *if* the specific preconditions set forth in section 6-21-440 have been met. *See Atlas Food Sys. & Servs., Inc. v. Crane Nat. Vendors Div. of Unidynamics Corp.*, 319 S.C. 556, 558, 462 S.E.2d 858, 859 (1995) ("The general rule of statutory construction is that a specific statute prevails over a more general one.") (citing *Mims v. Alston,* 312 S.C. 311, 313, 440 S.E.2d 357, 359 (1994)).

Turning to the facts of this case, there is a genuine issue of material fact as to whether the transfers into the City's General Fund are properly considered either "related" costs under section 6-1-330 or characterized as "surplus revenues" under section 6-21-440.

As to the $4.5 million diverted from the Enterprise Fund into the General Fund each year, the record reveals this City practice has been longstanding[8] and the

---

[7] *See also* S.C. Code Ann. § 6-21-480 (disposition of surplus in operation and maintenance fund); *id*. § 6-21-490 (disposition of surplus in depreciation fund); *id*. § 6-21-500 (disposition of surplus in contingent fund).

[8] Evidently, this practice was memorialized in 1993 through a resolution of the Columbia City Council, which provides that transfers from the water and sewer fund to the General Fund are permitted but should not be made where to do so would impair the City's ability to operate and maintain the system or service the related debt or result in a rate-increase for customers, among other things.

amount of the budgeted transfer does not seem to be impacted by any sort of periodic determination of the measurable, actual costs attributable to the water and sewer system.  For over fifteen years, the City's budget has included a blanket transfer into the General Fund in the amount of $4.5 million, which appears to be a pre-determined amount that is essentially treated as "surplus" revenue and transferred into the General Fund for disposition at the City's discretion.

Although section 6-21-440 allows for the discretionary disposition of surplus revenues in certain circumstances, we find there is a genuine issue of material fact as to whether the City has adequately funded the ongoing operating and maintenance expenses and satisfied the specific set-asides commanded by section 6-21-440 (including setting aside "sufficient" sums in the depreciation fund and the contingent fund) as a precondition to diverting $4.5 million into the General Fund each year.  Although there is some evidence to suggest that the City has made expenditures for maintenance and capital improvements to its utility infrastructure, there is also evidence that these maintenance efforts have been inadequately funded and insufficient to keep the utility system in good repair and working order as required by section 6-21-440.

The record reveals that in 2013, the United States, through the Environmental Protection Agency (EPA), and the State of South Carolina, through the Department of Health and Environmental Control (DHEC), sued the City in federal court for various violations of the federal Clean Water Act resulting from numerous sanitary sewer overflows and other water quality impairments.  This suit was ultimately settled by consent decree, in which the City agreed to implement a sound management program and to make necessary repairs and improvements to the water and sewer system—maintenance projects that should have been, but apparently were not, readily funded by the revenues from the set-aside funds required by section 6-21-440.[9]

Accordingly, summary judgment was premature, and we reverse and remand to the trial court for further development of the factual circumstances under which these transfers were purportedly justified and for a determination of whether these

---

[9] The City also agreed to pay civil penalties in the amount of $476,400 and expend an additional $1,000,000 in a supplemental environmental project to improve water quality and reduce flooding in specific parts of the City's service area.

transfers complied with the law.

## IV.

Finally, we reject the City's contention that interpreting section 6-1-330 to apply and limit the City's expenditure of service and user fees would effectively preclude any water and sewer revenues from ever being spent on anything other than the utility's direct costs. We do not construe the statutes in such a narrow and restrictive manner. Rather, the relevant statutory scheme expressly contemplates the unrestrained disposition of surplus funds under the appropriate circumstances. *See* S.C. Code Ann. § 6-21-440 (allowing "surplus revenues" to be "disposed of by the governing body of the borrower as it may determine from time to time to be for the best interest of the borrower" once certain preconditions are satisfied). However, absent the legislatively sanctioned process and progression that permit the expenditure of user fees as "surplus revenues," the law requires some nexus between the City's provision of water and sewer services and the underlying purpose of each expenditure or transfer of water and sewer funds. Simply put, the statutes do not allow these revenues to be treated as a slush fund.[10]

**REVERSED AND REMANDED.**

**TOAL, C.J., PLEICONES, BEATTY, and HEARN, JJ., concur.**

---

[10] We affirm pursuant to Rule 220(b)(1), SCACR, the trial court's denial of class action certification and its finding that Appellants Joseph Azar and Michael Letts lacked standing. Frank J. Cumberland, Jr., shall be the sole plaintiff on remand.