# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Patricia Damico and Lenna Lucas, Individually and on behalf of all others similarly situated, Joshua and Brettany Buetow, Edward and Sylvia Dengg, Jonathan and Theresa Douglass, Anthony and Stacey Ray, Danny and Ellen Davis Morrow, Czara and Chad England, Bryan and Cynthia Camara, and Matthew Collins, Respondents,

v.

Lennar Carolinas, LLC, Spring Grove Plantation Development, Inc., Manale Landscaping, LLC, Super Concrete of SC, Inc., Southern Green, Inc., TJB Trucking/Leasing, LLC, Paragon Site Constructors, Inc., Civil Site Environmental and Rick Bryant, Individually, Defendants,

of which Spring Grove Plantation Development, Inc., Manale Landscaping, LLC, Super Concrete of SC, Inc., Southern Green, Inc., TJB Trucking/Leasing, LLC, and Civil Site Environmental are Respondents.

and

Lennar Carolinas, LLC, Appellant,

v.

The Earthworks Group, Inc., Volkmar Consulting Services, LLC, Geometrics Consulting, LLC, Land/Site Services, Inc., Myers Landscaping, Inc., A.C. & A. Concrete, Inc., Knight's Concrete Products, Inc., Knight's Redi-Mix, Inc., Coastal Concrete Southeast, LLC, Coastal Concrete Southeast II, LLC, Guaranteed Framing, LLC, Ozzy Construction, LLC, Construction Applicators Charleston, LLC, LA New Enterprises, LLC,

Decor Corporation, DVS, Inc., Raul Martinez Masonry, LLC, Alpha Omega Construction Group, Inc., South Carolina Exteriors, LLC, Builders Firstsource-Southeast Group, LLC, and Low Country Renovations and Siding, LLP, Third-Party Defendants,

of which Volkmar Consulting Services, LLC, Land/Site Services, Inc., Myers Landscaping, Inc., A.C. & A. Concrete, Inc., Knight's Concrete Products, Inc., Knight's Redi-Mix, Inc., Coastal Concrete Southeast, LLC, Coastal Concrete Southeast II, LLC, Guaranteed Framing, LLC, Ozzy Construction, LLC, Construction Applicators Charleston, LLC, LA New Enterprises, LLC, Decor Corporation, DVS, Inc., Raul Martinez Masonry, LLC, Alpha Omega Construction Group, Inc., South Carolina Exteriors, LLC, Builders Firstsource-Southeast Group, LLC, are also Respondents.

and

Decor Corporation, Fourth Party Plaintiff,

v.

Baranov Flooring, LLC, DJ Construction Services, LLC, Creative Wood Floors, LLC, Geraldo Cunha, Ebenezer Flooring, LLC, Emmanuel Flooring and Siding, LLC, Eusi Flooring and Covering, LLC, Nicolas Flores, Alexander Martinez, Isidru Mejia, Juan Perez, N&B Construction, LLC, Jose Dias Rodrigues, Livia Sousa, Jose Paz Castro Hernandez, Divinio Aperecido Corgosinho, Ricardo Chiche, CEBS Construction, Bayshore Siding and Flooring, Sebastio Luiz de Araujo, and John Does 1-4, Fourth-Party Defendants.

of whom Patricia Damico, Joshua and Brettany Beutow, Bryan and Cynthia Camara, Matthew Collins, Jonathan and Teresa Douglas, Czarra and Chad England, Lena Lucas, and Danny and Ellen Davis Morrow are the Petitioners.

Appellate Case No. 2020-001048

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal from Berkeley County
J.C. Nicholson Jr., Circuit Court Judge

---

Opinion No. 28114
Heard February 1, 2022 – Filed September 14, 2022

---

## AFFIRMED IN PART, REVERSED IN PART, AND REMANDED

---

Jesse Sanchez, of The Law Office of Jesse Sanchez, John Calvin Hayes IV, of Hayes Law Firm, LLC, and Catherine Dunn Meehan, of The Steinberg Law Firm, LLP, all of Charleston; and Michael J. Jordan, of The Steinberg Law Firm, LLP, of Goose Creek, all for Petitioners.

James Lynn Werner, Jenna Brooke Kiziah McGee, and Katon Edwards Dawson Jr., all of Parker Poe Adams & Bernstein LLP, of Columbia, for Respondent Lennar Carolinas, LLC; Robert Trippett Boineau, Heath McAlvin Stewart III, and John Adam Ribock, all of McAngus, Goudelock & Courie, LLC, of Columbia, for Respondent Spring Grove Plantation Development, Inc.; Carmen Ganjehsani, James H. Elliott Jr., and Francis Heyward Grimball, all of Richardson, Plowden, & Robinson, of Columbia, for Respondents Manale Landscaping, LLC and Decor Corporation; Samia Hanafi Nettles, of Richardson Plowden & Robinson, PA, of Charleston, for Respondent Decor Corporation; Theodore

L. Manos, of Robertson Hollingsworth Manos & Rahn, LLC for Respondent Super Concrete of SC; David Cooper Cleveland and Trey Matthew Nicolette, both of Clawson and Staubes, LLC, of Charleston, for Respondent Myers Landscaping, Inc.; Rogers Edward Harrell III, of Murphy & Grantland, PA, of Columbia, for Respondents Knight's Concrete Products, Inc. and Knight's Redi-Mix, Inc.; Steven L. Smith and Zachary James Closser, both of Smith Closser, of Charleston, and Samuel Melvil Wheeler, of Whitfield-Cargile Law, PLLC, of Brevard, NC, all for Respondent Knight's Concrete Products, Inc.; Brent M. Boyd and Timothy J. Newton, both of Murphy & Grantland, PA, of Columbia, for Respondents Coastal Concrete Southeast, LLC and Coastal Concrete Southeast II, LLC; Alan Ross Belcher Jr. and Elizabeth Wieters, both of Hall Booth Smith, PC, of Mount Pleasant, and Christine Companion Varnado, of Siebels Law Firm, of Charleston, all for Respondent Guaranteed Framing, LLC; Erin DuBose Dean, of Tupper, Grimsley, Dean & Canaday, PA, of Beaufort, for Respondents LA New Enterprises Construction, Inc. and Raul Martinez Masonry; Stephen Lynwood Brown and Catherine Holland Chase, both of Clement Rivers, LLP, of Charleston, and Preston Bruce Dawkins Jr., of Aiken Bridges Elliott Tyler & Saleeby, PA, of Florence, all for Respondent Alpha Omega Construction Group, Inc.; and Jenny Costa Honeycutt, of Best Honeycutt, PA, of Charleston, for Respondent South Carolina Exteriors, LLC; Clarke W. DuBose, of Haynsworth Sinkler Boyd, PA, of Columbia, for Respondent Southern Green, Inc.; Stephen P. Hughes, of Howell Gibson & Hughes, PA, of Beaufort, for Respondent Builders Firstsource-Southeast Group, LLC; Ronald G. Tate Jr., of Gallivan, White & Boyd, PA, and Robert Batten Farrar, of Rogers Townsend, LLC, both of Greenville, for Respondent Volkmar Consulting Services, LLC;  Sidney Markey Stubbs, of Baker Ravenel & Bender, LLP, of Columbia, for Respondent DVS, Inc.; David Shuler Black, of Howell Gibson & Hughes, PA, of Beaufort, for Respondent TJB Trucking/Leasing, LLC; Shanna

Milcetich Stephens and Wade Coleman Lawrimore, both
of Anderson Reynolds & Stephens, LLC, of Charleston,
for Respondent A.C.&A. Concrete, Inc.; John Elliott
Rogers II, of Ward Law Firm, PA, of Spartanburg, for
Respondent Land/Site Services, Inc.; David Starr Cobb,
of Turner Padget Graham & Laney, PA, of Charleston,
for Respondent Construction Applicators Charleston,
LLC; Kathy Aboe Carlsten, of Copeland, Stair, Valz &
Lovell, LLP, and N. Keith Emge Jr., of Resnick & Louis,
PC, both of Charleston, for Respondent Civil Site
Environmental, Inc.; Scott Harris Winograd, Jeffrey A.
Ross, and Philip Paul Cristaldi III, all of Ross &
Cristaldi, LLC, of Mount Pleasant, for Respondent Ozzy
Construction, LLC.

---

**JUSTICE KITTREDGE:**  This case arises out of a construction defect suit brought by a number of homeowners (Petitioners) against their homebuilder and general contractor, Lennar Carolinas, LLC (Lennar).  Lennar moved to compel arbitration, citing the arbitration provisions in a series of contracts signed by Petitioners at the time they purchased their homes.  As we will explain, those contracts were contracts of adhesion.  Petitioners pointed to purportedly unconscionable provisions in the contracts generally and in the arbitration provision specifically.  Citing a number of oppressive terms in the contracts, and without delineating between the contracts generally and the arbitration provision specifically, the circuit court denied Lennar's motion to compel, finding the contracts were grossly one-sided and unconscionable and, thus, the arbitration provisions contained within those contracts were unenforceable.  The court of appeals reversed, explaining that the United States Supreme Court's holding in *Prima Paint Corp. v. Flood & Conklin Manufacturing Co.* forbids consideration of unconscionable terms outside of an arbitration provision (the *Prima Paint* doctrine).[1]  *Damico v. Lennar Carolinas, L.L.C.*, 430 S.C. 188, 844 S.E.2d 66 (Ct.

---

[1] *See generally Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–06 (1967) (explaining that under the Federal Arbitration Act, courts may "consider only issues relating to the making and performance of the agreement to arbitrate," rather than those affecting the contract as a whole); *S.C. Pub. Serv. Auth. v. Great W. Coal (Ky.), Inc.*, 312 S.C. 559, 562–63, 437 S.E.2d 22, 24 (1993) (holding *Prima Paint* applied not only to claims of fraud in the inducement of an arbitration agreement, but to all contract defenses, including unconscionability, and

App. 2020).  The court of appeals found the circuit court's analysis ran afoul of the *Prima Paint* doctrine as it relied on the oppressive nature of terms outside of the arbitration provisions.

While we agree with the court of appeals that the circuit court violated the *Prima Paint* doctrine, we nonetheless agree with Petitioners and find the arbitration provisions—standing alone—contain a number of oppressive and one-sided terms, thereby rendering the provisions unconscionable and unenforceable under South Carolina law.  We further decline to sever the unconscionable terms from the remainder of the arbitration provisions for two reasons.  First, doing so would require us to blue-pencil the agreement regarding a material term of the contract, a result strongly disfavored in contract disputes.  Second, as a matter of policy, we find severing terms from an unconscionable contract of adhesion (in this case, an arbitration provision) discourages fair, arms-length transactions.  Rather, were we to honor the severability clause in contracts such as these, it would encourage sophisticated parties to intentionally insert unconscionable terms—that often go unchallenged—throughout their contracts, believing the courts would step in and rescue the party from its gross overreach.  This is not to say severability clauses in general should not be honored, because of course we are constrained to enforce a contract in accordance with the parties' intent.  Rather, we merely recognize that where a contract would remain one-sided and be fragmented after severance, the better policy is to decline the invitation for judicial severance.  We therefore affirm in part and reverse in part the court of appeals' decision and reinstate the circuit court's denial of Lennar's motion to compel.

## I.

The Abbey is a subdivision in the Spring Grove Plantation neighborhood located in Berkeley County and consists of sixty-nine single-family homes constructed between 2010 and 2015.  The lots in the Abbey were originally owned and developed by Spring Grove Plantation Development, Inc. (Spring Grove), which graded the area and constructed the storm drainage system and roads.  Spring Grove in turn sold the partially-developed subdivision to Lennar, which completed construction with the help of a number of subcontractors and sold all sixty-nine homes.

---

stating that "a party cannot avoid arbitration through rescission of the entire contract when there is no independent challenge to the arbitration clause").

In the course of development, Petitioners contracted with Lennar to build new homes to their specifications in The Abbey.[2] As part of those transactions, Lennar and Petitioners executed individual form contracts (the purchase and sale agreement) containing an arbitration provision. Section 16 of the purchase and sale agreement, titled "Mediation/Arbitration of Disputes," contains ten, numbered paragraphs setting forth the arbitration agreement. In relevant part, paragraph 1 states:

> The parties to this [purchase and sale a]greement specifically agree that this transaction involves interstate commerce and that any Dispute . . . shall first be submitted to . . . binding arbitration as provided by the Federal Arbitration Act . . . . "Disputes" (whether contract, warranty, tort, statutory or otherwise)[] shall include, but are not limited to, any and all controversies, disputes or claims (1) arising under, or related to, this [purchase and sale a]greement, the Property, the Community or any dealings between Buyer and [Lennar]; (2) arising by virtue of any . . . warranties alleged to have been made by [Lennar] or [Lennar's] representatives; and (3) relating to personal injury or property damage alleged to have been sustained by Buyer, Buyer's children or other occupants of the Property, or in the Community. Buyer has executed this [purchase and sale a]greement on behalf of his or her children and other occupants of the Property with the intent that all such parties be bound hereby.

Paragraph 4 further provides "that [Lennar] may, at its sole election, include [Lennar's] contractors, subcontractors and suppliers, as well as any warranty company and insurer as parties in the mediation and arbitration" and "that the mediation and arbitration will be limited to the parties specified herein." Finally, paragraph 5 states, "Buyer and [Lennar] further agree that no finding or stipulation of fact, no conclusion of law, and no arbitration award in any arbitration hereunder shall be given preclusive or collateral estoppel effect in any other arbitration, judicial, or similar proceeding unless there is mutuality of parties."

After closing on their new homes, Petitioners became aware of damage to their properties, which they attributed to Spring Grove, Lennar, and the subcontractors

---

[2] We note Petitioner Lenna Lucas bought a pre-owned home built by Lennar in the Abbey, so there is no direct contract between Petitioner Lucas and Lennar.

(collectively, Respondents). As a result, they filed a construction defect suit against Respondents for, among other things, negligence, breach of contract, and breach of various warranties.

Subsequently, Lennar moved to compel arbitration under either the Federal Arbitration Act (FAA)[3] or the South Carolina Uniform Arbitration Act (SCUAA).[4] As is relevant to this appeal, Lennar argued Petitioners were required to arbitrate under two different contracts: (1) the purchase and sale agreement; and (2) a limited home warranty agreement (the limited warranty booklet). The arbitration provisions within both contracts are virtually identical, so for ease of reference, we will refer only to the terms in the purchase and sale agreement unless otherwise noted. Petitioners opposed Lennar's motion to compel arbitration, claiming, among other things, that the arbitration agreement was unconscionable.

Ultimately, the circuit court denied Lennar's motion to compel. Initially, the circuit court found the "arbitration agreement" consisted of the entirety of the purchase and sale agreement and the limited warranty booklet, explaining the extensive cross-references between the two contracts combined them into a single agreement akin to that found in *Smith v. D.R. Horton, Inc.*, 417 S.C. 42, 790 S.E.2d 1 (2016) (holding an arbitration agreement was not merely a standalone provision but was instead embedded in multiple contract terms, including ones dealing with a limited home warranty). Likewise, the circuit court held the contracts were unconscionable, citing a number of oppressive, one-sided provisions. The court declined to sever the unconscionable provisions because the oppressive terms pervaded the entirety of the contracts, "thereby rendering 'severability' impractical, if not impossible."[5]

---

[3] 9 U.S.C. §§ 1–16 (2021).

[4] S.C. Code Ann. §§ 15-48-10 to -240 (2005).

[5] The circuit court additionally held arbitration could not be compelled under federal or state law. Specifically, the court determined the contracts involved intrastate commerce, rather than interstate commerce, and therefore the FAA did not apply. Further, the circuit court determined the arbitration agreement did not comply with the SCUAA, specifically, section 15-48-10(a). *See* S.C. Code Ann. § 15-48-10(a) ("Notice that a contract is subject to arbitration pursuant to [the SCUAA] shall be typed in underlined capital letters . . . on the first page of the contract and unless such notice is displayed thereon the contract shall not be

Lennar appealed, and the court of appeals reversed. In relevant part, the court of appeals found the arbitration agreement between Petitioners and Lennar consisted only of Section 16 of the purchase and sale agreement. Relying on the *Prima Paint* doctrine, the court of appeals held the circuit court wrongly considered terms outside of the actual arbitration agreement. In particular, the court of appeals distinguished the "intertwined" arbitration agreement in *D.R. Horton* from the "distinct, separate" arbitration agreement in the purchase and sale agreement, and found the circuit court impermissibly considered the terms found in the limited warranty booklet. However, the court of appeals ended its analysis upon concluding that the arbitration agreement was composed entirely of Section 16 of the purchase and sale agreement.

While we agree with the court of appeals in that regard, we find it necessary to continue the analysis to determine whether any terms within Section 16 of the purchase and sale agreement were unconscionable in and of themselves. We therefore granted Petitioners' petition for a writ of certiorari.

## II.

As an initial matter, Petitioners argue the contracts at issue do not involve interstate commerce, and therefore Lennar cannot compel Petitioners to arbitrate under federal law, namely, the FAA. We disagree. The transactions here manifestly involve interstate commerce, as they involved the construction of new homes built to Petitioners' specifications rather than the purchase of pre-existing homes. *See, e.g.*, *Bradley v. Brentwood Homes, Inc.*, 398 S.C. 447, 458 n.8, 730 S.E.2d 312, 318 n.8 (2012) ("[O]ur appellate courts have consistently recognized that contracts for construction are governed by the FAA."); *Episcopal Hous. Corp. v. Fed. Ins. Co.*, 269 S.C. 631, 640, 239 S.E.2d 647, 652 (1977) (explaining that contracts requiring the construction of a new building implicate interstate commerce because it would be "virtually impossible" to construct the building "with materials, equipment[,] and supplies all produced and manufactured solely within the State of South Carolina"). Because federal law preempts state law in this instance, we need not decide whether Lennar could also compel arbitration under the SCUAA.

---

subject to arbitration [pursuant to the SCUAA].").

## III.

Petitioners present two challenges to the court of appeals' opinion. First, Petitioners defend the circuit court's reliance on *D.R. Horton*, asserting the court of appeals erred in limiting the scope of the arbitration agreement to Section 16 of the purchase and sale agreement alone. Specifically, Petitioners claim the purchase and sale agreement and the limited warranty booklet expressly incorporate one another by reference and extensively cross-reference one another such that one cannot be read without the other. Petitioners therefore contend the two contracts should be read as one large arbitration agreement rather than two separate contracts. We agree with the court of appeals and reject Petitioners' first argument.

Pursuant to the *Prima Paint* doctrine, the FAA requires courts to separate the validity of an arbitration clause from the validity of the contract in which it is embedded. *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 540, 542 S.E.2d 360, 364 (2001) (citing *Prima Paint*, 388 U.S. at 395). The validity of the arbitration clause is a matter for the courts, whereas the validity of the contract as a whole is a matter for the arbitrator. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006) ("[U]nless the challenge is to the arbitration clause itself, the issue of the contract's validity is considered by the arbitrator in the first instance.").

As a result, as we stated in *D.R. Horton*, "in conducting an unconscionability inquiry, courts may only consider the provisions of the arbitration agreement itself, and not those of the whole contract." 417 S.C. at 48, 790 S.E.2d at 4. Necessarily, then, the Court must first define the scope of the arbitration agreement before considering whether that agreement is unconscionable. *Id.* at 48 n.4, 790 S.E.2d at 3 n.4 (explaining the scope of the arbitration agreement must first be determined "because it controls which portions of the Agreement we may properly consider in conducting our unconscionability analysis").

In *D.R. Horton*, one of the central issues involved defining the scope of the arbitration agreement. *Id.* at 48, 790 S.E.2d at 4. The plaintiff-homeowners claimed the arbitration agreement comprised the entire section of the contract titled "Warranties and Dispute Resolution"; the defendant-homebuilder claimed the arbitration agreement was contained solely within one subparagraph of that section. *Id.* A majority of the Court ultimately agreed with the plaintiffs, finding the arbitration agreement broadly encompassed the entirety of the "Warranties and Dispute Resolution" section of the contract. *Id.* The Court explained the various subparagraphs in the "Warranties and Dispute Resolution" section "contain[ed] numerous cross-references to one another, intertwining the subparagraphs so as to constitute a single provision." *Id.* Therefore, the Court concluded that the section

as a whole—including the subparagraphs relating to arbitration *and* those relating to warranties—"must be read [together] to understand the scope of the warranties and how different disputes are to be handled."  *Id.*

Here, in contrast to *D.R. Horton*, there is a distinct section of the purchase and sale agreement that sets forth the entirety of the arbitration agreement.  As correctly noted by the court of appeals, Section 16 of the agreement—titled "Mediation/Arbitration of Disputes"—deals solely with the scope of arbitration and the requisite formalities accompanying an arbitration proceeding, such as the procedural rules and the number of arbitrators required to resolve the dispute. Within Section 16, there is nothing that refers to the limited warranty booklet or incorporates it by reference.  Rather, Section 16 is a standalone arbitration provision, dissimilar from that in *D.R. Horton*.

We therefore find the arbitration agreement is contained solely within Section 16 of the purchase and sale agreement.[6]

## IV.

Petitioners' second argument posits that even assuming the court of appeals correctly narrowed the scope of the arbitration agreement to Section 16 of the purchase and sale agreement, it nonetheless erred in failing to analyze whether Section 16 contained unconscionable terms that would render the agreement to arbitrate unenforceable.  Petitioners contend they lacked a meaningful choice with

---

[6] As noted above, the limited warranty booklet contains an arbitration agreement that uses identical language to Section 16 of the purchase and sale agreement. Because the arbitration agreements in both contracts are standalone provisions, it is legally irrelevant that the portions of the contracts outside of the arbitration agreements extensively cross-reference one another and incorporate one another by reference.  *See Buckeye Check Cashing, Inc.*, 546 U.S. at 445–46 ("*Prima Paint* and *Southland* [*Corp. v. Keating*, 465 U.S. 1 (1984),] . . . establish[ed] three propositions.  First, as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract.  Second, unless the challenge is to the arbitration clause itself, the issue of the contract's validity [as a whole] is considered by the arbitrator in the first instance.  Third, this arbitration law applies in state as well as federal courts.").

respect to Section 16 and that certain terms in Section 16 are so oppressive that no reasonable person would have agreed to them. We agree and now turn to the general law of unconscionability.

Section 2 of the FAA provides that any arbitration provision contained within a written contract involving interstate commerce must be enforced except for "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "Thus, generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening [the FAA]." *Dr.'s Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996).

At its core, unconscionability is defined "as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms which are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Fanning v. Fritz's Pontiac-Cadillac-Buick, Inc.*, 322 S.C. 399, 403, 472 S.E.2d 242, 245 (1996); 17A Am. Jur. 2d *Contracts* § 272 (2016) (characterizing these two prongs as procedural and substantive unconscionability, respectively); *see also id.* § 271 ("Generally, the doctrine of unconscionability protects against unfair bargains and unfair bargaining practices . . . ."). This general description of unconscionability applies to all contract terms, not merely arbitration provisions. *Cf. AT&T Mobility L.L.C. v. Concepcion*, 563 U.S. 333, 339 (2011) (noting that while arbitration agreements may be invalidated by generally applicable contract defenses, including unconscionability, they may not be invalidated by "defenses that apply only to arbitration or derive their meaning from the fact that an agreement to arbitrate is at issue"). *Compare Fanning*, 322 S.C. at 403, 472 S.E.2d at 245 (involving an unconscionability analysis of a contract that did not contain an arbitration provision), *with Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 24–25, 644 S.E.2d 663, 668 (2007) (involving a similar unconscionability analysis for a contract that contained an arbitration provision).

A determination of whether a contract is unconscionable depends upon all the facts and circumstances of the case. *S.C. Farm Bureau Mut. Ins. Co. v. Kennedy*, 398 S.C. 604, 614, 730 S.E.2d 862, 867 (2012) (citation omitted). Indeed, we have previously "emphasize[d] the importance of a case-by-case analysis in order to address the unique circumstances inherent in the various types of consumer transactions." *Compare Simpson*, 373 S.C. at 36, 644 S.E.2d at 674 (holding an adhesion contract between an automobile dealership and a customer was unconscionable), *with Munoz*, 343 S.C. at 541–42, 542 S.E.2d at 365 (declining to find unconscionable an adhesion contract between a consumer and a lender). "In

analyzing claims of unconscionability in the context of arbitration agreements, the [United States Court of Appeals for the] Fourth Circuit has instructed courts to focus generally on whether the arbitration clause is geared towards achieving an unbiased decision by a neutral decision-maker." *Simpson*, 373 S.C. at 25, 644 S.E.2d at 668–69 (citing *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 938–40 (4th Cir. 1999)).

As explained further below, a take-it-or-leave-it contract of adhesion is not necessarily unconscionable, even though it may indicate one party lacked a meaningful choice. *See generally* 17A Am. Jur. 2d *Contracts* § 274; 17 C.J.S. *Contracts* § 9 & n.9 (2020) (collecting cases). Rather, to constitute unconscionability, the contract terms must be so oppressive that no reasonable person would make them and no fair and honest person would accept them. *Fanning*, 322 S.C. at 403, 472 S.E.2d at 245; *see also* 17A Am. Jur. 2d *Contracts* § 272 ("Although procedural and substantive unconscionability must both be present in order for a court to exercise its discretion to refuse to enforce a contract or clause under the doctrine of unconscionability, both need not be present to the same degree; the agreement may be judged on a sliding scale: the more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa. In an exceptional case, however, a court may find that a contract provision is so outrageous as to warrant holding it unenforceable on the grounds of substantive unconscionability alone." (footnotes omitted)). In this case, we do not hesitate in upholding the finding of unconscionability concerning Section 16 of the purchase and sale agreement.

## A.

As noted, under South Carolina law, the same principles of unconscionability apply to contract terms and arbitration provisions alike. The touchstone of the analysis begins with the presence or absence of meaningful choice. *See Fanning*, 322 S.C. at 403, 472 S.E.2d at 245; *see also Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 361 S.C. 544, 555, 606 S.E.2d 752, 758 (2004), 361 S.C. at 555, 606 S.E.2d at 758 (explaining that a party seeking to prove an arbitration agreement is unconscionable must allege he lacked a meaningful choice as to the arbitration clause specifically, not merely that he lacked a meaningful choice as to the contract as a whole). "Whether one party lacks a meaningful choice . . . typically speaks to the fundamental fairness of the bargaining process." *D.R. Horton*, 417 S.C. at 49, 790 S.E.2d at 4 (citation omitted). Thus, in determining whether an absence of meaningful choice taints a contract term, such as an arbitration provision, courts must consider, among all facts and circumstances, the

relative disparity in the parties' bargaining power, the parties' relative sophistication, and whether the plaintiffs are a substantial business concern of the defendant. *Simpson*, 373 S.C. at 25, 644 S.E.2d at 669; *see generally* 17A Am Jur. 2d *Contracts* § 272 (listing a number of factors that courts may considering in conducting an unconscionability analysis); 17 C.J.S. *Contracts* § 10 (same).

Parties frequently claim they lack a meaningful choice when a contract of adhesion is involved. *D.R. Horton*, 417 S.C. at 49, 790 S.E.2d at 4 (explaining adhesion contracts are "standard form contracts offered on a take-it or leave-it basis with terms that are not negotiable" (internal alteration marks omitted) (citation omitted)). Because contracts of adhesion are non-negotiable, "[a]n offeree faced with such a contract has two choices: complete adherence or outright rejection." *Lackey v. Green Tree Fin. Corp.*, 330 S.C. 388, 394, 498 S.E.2d 898, 901 (Ct. App. 1998) (citation omitted).

Adhesion contracts are not per se unconscionable. *Simpson*, 373 S.C. at 27, 644 S.E.2d at 669; 17A Am. Jur. 2d *Contracts* § 274; 17 C.J.S. *Contracts* § 9 & n.9 (collecting cases). However, given that one party to an adhesion contract "has virtually no voice in the formulation of the[] terms and language" used in the contract, *Lackey*, 330 S.C. at 394, 498 S.E.2d at 901, courts tend to view adhesive arbitration agreements with "considerable skepticism," as it remains doubtful "any true agreement ever existed to submit disputes to arbitration," *Simpson*, 373 S.C. at 26, 644 S.E.2d at 669 (citations omitted). *See also* 17A Am. Jur. 2d *Contracts* § 274 (noting that "[c]ontracts of adhesion are enforceable unless they are unconscionable," but "[n]evertheless, the fact that a contract is one of adhesion is a strong indicator that [there was] an absence of meaningful choice"); 17 C.J.S. *Contracts* § 9 ("A consumer transaction which is essentially a contract of adhesion may be examined by the courts with special scrutiny to assure that it is not applied in an unfair or unconscionable manner against the party who did not participate in its drafting.").

The distinction between a contract of adhesion and unconscionability is worth emphasizing: *adhesive contracts are not unconscionable in and of themselves **so long as the terms are even-handed***. Nevertheless, and regrettably, it is common practice for the sophisticated drafter of contracts to routinely argue that a particular contract is not one of adhesion when that is plainly untrue. Such a specious argument does not advance the party's position and instead detracts from other legitimate arguments the party may have. After all, unconscionability requires a finding of a lack of meaningful choice *coupled with* unreasonably oppressive

terms. Thus, an adhesion contract with fair terms is certainly not unconscionable, and the mere fact a contract is one of adhesion does not doom the contract-drafter's case.

Here, we find it manifest that the purchase and sale agreement is a contract of adhesion given by Lennar to all of the homebuyers in the Abbey, with only a few blank spaces to fill in, including the buyer's name, the relevant property address, and the purchase price. Other than those type of minor blank spaces, the terms of the purchase and sale agreement—particularly those of any consequence to Lennar—are non-negotiable, with some terms not even applying to specific homebuyers.[7]

Moreover, the sophistication of Petitioners, as individual homebuyers, pales in comparison to Lennar. Given that Lennar has sold thousands of homes in the Carolinas, whereas Petitioners will likely only purchase, at best, a handful of homes in their entire lifetime, we find it fair to characterize Lennar as significantly more sophisticated than Petitioners in home buying transactions. These factors combine to highlight the significant disparity in the parties' bargaining power, with Lennar enjoying a much stronger bargaining position than Petitioners. We therefore find Petitioners lacked a meaningful choice in their ability to negotiate the arbitration agreement. *See Kennedy v. Columbia Lumber & Mfg. Co.*, 299 S.C. 335, 343, 384 S.E.2d 730, 735–36 (1989) ("We have [] taken judicial cognizance of the fact that a modern buyer of new residential housing is normally in an unequal bargaining position as against the seller.").

**B.**

Within Section 16, Petitioners point to three provisions that are allegedly so one-sided and unreasonable as to render the agreement unconscionable. Specifically, Petitioners claim provisions in paragraphs 1, 4, and 5 require the Court to invalidate the arbitration agreement. We agree. Because paragraph 4 of Section 16 of the purchase and sale agreement contains the most egregious term, we focus our attention there.[8]

---

[7] For example, Section 4 of the purchase and sale agreement lists two financing options that are mutually exclusive with one another, with checkboxes to mark which of the two options applies for any particular client.

[8] We note Lennar made no attempt in its brief to defend paragraph 4 from Petitioners' unconscionability challenge.

In particular, paragraph 4 states, "Seller may, *at its sole election*, include Seller's contractors, subcontractors and suppliers, as well as any warranty company and insurer as parties in the mediation and arbitration; and . . . the mediation and arbitration will be limited to the parties specified herein." (Emphasis added.) It is a fundamental principle of law that the plaintiff is the master of his own complaint and is the sole decider of whom to sue for his injuries. *Myles v. United States*, 416 F.3d 551, 552 (7th Cir. 2005) ("[L]itigants are masters of their own complaints and may choose who to sue—or not to sue."); 71 C.J.S. *Pleading* § 149 (Supp. 2021) (citation omitted). Giving Lennar the "sole election" to include or exclude subcontractors in the arbitration proceeding strips Petitioners of that right and overturns a firmly entrenched legal principle. *Cf.* 17A Am. Jur. 2d *Contracts* § 272 ("Mutuality [] is a paramount consideration when assessing the substantive unconscionability of a contract term.").

It is equally concerning that paragraph 4, in conjunction with paragraph 5, creates the possibility of inconsistent factual findings that would preclude Petitioners from recovery on a purely procedural (rather than a merit) basis—a legal defense to which neither Lennar nor the other Respondents are entitled. In particular, paragraph 5 states the parties agree no factual or legal finding made in arbitration is binding in any other arbitral or judicial proceeding "unless there is mutuality of parties." However, Lennar can ensure there is never a "mutuality of parties" by exercising its "sole election" in paragraph 4 to choose the parties to the arbitration. Suppose Lennar is unable or—of more concern—unwilling to compel the other named defendants to arbitrate, instead forcing Petitioners to litigate with the remaining defendants in circuit court. In that case, it is possible for the arbitration defendants to blame the remaining circuit-court defendants for Petitioners' damages, and vice versa. Were the respective fact finders to agree with the defendants' arguments to that effect, Petitioners could lose in both forums merely because the fact finder believes the absent defendants to be at fault, and, critically, *it is not Petitioners' choice that those defendants are absent*. Compounding the problem, paragraph 5 prevents any findings of fact or conclusions of law in the arbitration to be binding in any subsequent arbitral or judicial proceeding instituted by Petitioners to recover their damages fully. Thus, Petitioners could not even use the fact that the arbitrator had found Lennar was not at fault when pursuing liability against the remaining circuit-court defendants, or vice versa.

This creation of a procedural defense to liability for Lennar is wholly unreasonable and oppressive to Petitioners. Moreover, the likelihood of inconsistent factual findings due to paragraphs 4 and 5 of the arbitration agreement—and the resultant, inherent unfairness to Petitioners—has become probable, rather than merely

theoretically possible. We say this because, as it stands now, Spring Grove and a significant number of the subcontractors are not required to arbitrate with Lennar and Petitioners because either (1) their contracts with Lennar do not contain an arbitration provision; or (2) their contracts with Lennar (including the arbitration agreements therein) were executed after Petitioners filed their lawsuit, i.e., after the subcontractors had completed the work on Petitioners' homes and the Abbey in general; or (3) they did not have a contract with Lennar at all—much less an arbitration agreement.

As a result, we hold the arbitration agreement is unconscionable and unenforceable as written.

Ordinarily, the question of unconscionability beyond the arbitration provision would be determined in the arbitral forum. *See Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71–72 (2010). However, in agreeing with the circuit court concerning the unconscionability of the arbitration provision, we note our additional agreement with the circuit court that unconscionability pervades the various agreements between the parties. An example of the oppressive, one-sided nature of the parties' agreement includes a provision that Petitioners "*expressly negotiated and bargained for the waiver of the implied warranty of habitability [for] valuable consideration . . . **in the amount of $0***." (Emphasis added.) Lennar also specifically states the "[l]oss of use of all or a portion of your Home" is not covered by its warranty to new homebuyers.[9] Likewise, another provision of the adhesive contract states, "[T]his Agreement shall be construed as if both parties jointly prepared it"—a blatant falsehood—"and no presumption against one party or the other shall govern the interpretation or construction of any of the provisions of this Agreement." Yet another provision asserts, "Buyer acknowledges that *justice will best be served* if issues regarding this agreement are heard by a judge in a court proceeding, and not a jury." (Original emphasis omitted, new emphasis added.) This is not even to mention the fact that Lennar attempted to insert an arbitration agreement in Petitioners' deeds, characterizing the arbitration agreement as an "equitable servitude" that runs with the land in perpetuity.

---

[9] Apparently, for Lennar to even *consider* repairing any defects in the homes they construct and sell, the defects must be minor and become apparent very quickly after the sale date. Otherwise, Lennar is off the hook for the defective housing, and the innocent homebuyers are out of luck. After all, Lennar specifically disclaims any responsibility to fix major problems to the home that result in the homebuyers losing partial or complete use of their (not-inexpensive) home.

We find these and other terms of the contracts to be absurd, factually incorrect, and grossly oppressive. While none of these terms factor into our unconscionability analysis for the arbitration agreement, we recognize that although the circuit court failed to honor the *Prima Paint* doctrine, it certainly hit the nail on the head in characterizing the contracts as unquestionably unconscionable.

## V.

Lennar does not argue to this Court that, should we find any provision of the arbitration agreement unconscionable, we should sever that portion of the agreement in accordance with the severability clause found in the arbitration agreement.[10] However, because Lennar made a severability argument to the circuit court and court of appeals, we assume Lennar views it as an additional sustaining ground and therefore address it in the interest of judicial economy. As we will explain, we decline to sever the unconscionable provisions of the arbitration agreement.

If a court finds a contract clause unconscionable, the court may refuse to enforce the contract clause, or it may limit the application of the unconscionable clause so as to avoid any possible unconscionable result. S.C. Code Ann. § 36-2-302(1) (2003); *Lackey*, 330 S.C. at 397, 498 S.E.2d at 903; 17A Am. Jur. 2d *Contracts* § 313. However, severability is not always appropriate to remedy unconscionable contractual provisions. *Simpson*, 373 S.C. at 34, 644 S.E.2d at 673; 17A Am Jur. 2d *Contracts* § 314. In particular, courts are reluctant to sever the unconscionable provisions when illegality pervades the entire agreement "such that only a disintegrated fragment would remain after hacking away the unenforceable parts." *Simpson*, 373 S.C. at 34, 644 S.E.2d at 673 (citation omitted); *see also* 17A Am Jur. 2d *Contracts* § 314. In those cases, judicial severing "look[s] more like rewriting the contract than fulfilling the intent of the parties." *Simpson*, 373 S.C. at 34, 644 S.E.2d at 673 (citation omitted); *see also* 17A Am Jur. 2d *Contracts* § 313.

Thus, "[c]ourts have discretion [] to decide whether a contract is so infected with unconscionability that it must be scrapped entirely, or to sever the offending terms so the remainder may survive." *Doe v. TCSC, L.L.C.*, 430 S.C. 602, 615, 846 S.E.2d 874, 880 (Ct. App. 2020); *see also Simpson*, 373 S.C. at 36, 644 S.E.2d at 674 (noting there is no specific set of factual circumstances indicating when

---

[10] Paragraph 4 of Section 16 of the purchase and sale agreement states, "The waiver or invalidity of any portion of this Section shall not affect the validity or enforceability of the remaining portions of this Section."

complete invalidation of the contract is a better option than merely excising the offending clauses). In exercising their discretion, courts should be guided by the parties' intent. *Doe*, 430 S.C. at 615, 846 S.E.2d at 880; 17A Am. Jur. 2d *Contracts* §§ 313–14; *see also* 17A Am. Jur. 2d *Contracts* § 273 ("To assess whether unconscionable terms can be severed from a contract or whether the entire contract should be invalidated, a court considers whether the illegality is central or collateral to the purpose of the contract.").

## A.

We first note the unconscionable portion of the agreement Lennar presumably wishes us to sever from the remainder of paragraph 4 deals with the proper, "agreed upon"[11] parties to the arbitration proceeding. We decline to blue-pencil that provision.

It goes without saying that the clause of a contract that names the persons or entities that may properly be joined as parties to proceedings arising from any dispute involving that contract is a material term of the agreement. *Cf. Grant v. Magnolia Manor-Greenwood, Inc.*, 383 S.C. 125, 131–32, 678 S.E.2d 435, 439 (2009) (discussing when a term is integral to a contract, as compared to an "ancillary logistical concern," and explaining courts must look to the "essence" of the arbitration agreement; "[w]here [a particular term] has implications *that may substantially affect the substantive outcome of the resolution*, we believe that it is neither 'logistical' nor 'ancillary.'" (emphasis added)). Were we to sever such a clause from the arbitration agreement here, it would be the opposite of excising an "ancillary logistical concern." Rather, we would be materially rewriting the contract by controlling who will—or will not—participate in arbitration.

Blue-pencilling an agreement is, of course, within the Court's discretion. Here, we decline to excise a material term of the arbitration agreement and enforce the remaining, fragmented agreement. *See Stevens & Wilkinson of S.C., Inc. v. City of Columbia*, 409 S.C. 568, 578, 762 S.E.2d 696, 701 (2014) ("A valid and enforceable contract requires a meeting of the minds between the parties with regard to *all* essential and material terms of the agreement." (citation omitted)); *cf.*

---

[11] We say "agreed upon" in quotation marks to emphasize that this is an adhesion contract, making it "considerably doubtful" the agreement truly encapsulates *both* parties' intent. *See Simpson*, 373 S.C. at 26, 644 S.E.2d at 669 (citation omitted). Nonetheless, because Lennar drafted the adhesion contract, we assume it does accurately represent Lennar's intent.

*id.* at 579, 762 S.E.2d at 701 (noting even when parties manifest an intent to be bound, an indefinite material term may invalidate the agreement (quoting 1 Corbin on Contracts § 2.8 (Rev. ed. 1993))); *Shotts v. OP Winter Haven, Inc.*, 86 So. 3d 456, 478 (Fla. 2011) ("Further, if the [unconscionable] provision were severed, the trial court would be hard pressed to conclude with reasonable certainty that, with the illegal provision gone, there still remains of the contract valid legal promises on one side which are wholly supported by valid legal promises on the other— particularly[] when those legal promises are viewed through the eyes of the contracting parties." (internal quotation marks omitted) (internal citation omitted)). Succinctly stated, once we sever the unconscionable terms in the arbitration provision, there is essentially nothing left.

## B.

There are two additional, important considerations in this case that bear on severability. The first of these two considerations is that this arbitration agreement—and, indeed, the purchase and sale agreement as a whole—is a contract of adhesion. As mentioned above, adhesion contracts "are subject to considerable skepticism upon review, due to the disparity in bargaining positions of the parties." *Simpson*, 373 S.C. at 26, 644 S.E.2d at 669 (citation omitted); *see also* 17A Am. Jur. 2d *Contracts* § 274; 17 C.J.S. *Contracts* § 9. In particular, when a contract of adhesion is at issue, "there arises considerable doubt that any true agreement ever existed to submit disputes to arbitration." *Simpson*, 373 S.C. at 26, 644 S.E.2d at 669 (citation omitted). Similarly, given the adhesive nature of the contract here, we find it "considerably doubtful" any true agreement ever existed to sever any oppressive provisions from the arbitration agreement, particularly given that the less sophisticated and less powerful party(s) (Petitioners) had no hand in drafting or negotiating any of the language of the arbitration agreement. *See Doe*, 430 S.C. at 615, 846 S.E.2d at 880 (explaining that when exercising its discretion to sever portions of the agreement, a court must be guided by the parties' intent).

The second additional consideration of which we take note is that this contract involves a consumer transaction. *See Simpson*, 373 S.C. at 36, 644 S.E.2d at 674 (placing emphasis on the need for a case-by-case analysis in cases involving consumer transactions so as to address the unique circumstances inherent in those types of contacts). More specifically, this contract involves the purchase of a new home. South Carolina has a deeply-rooted and long-standing policy of protecting new home buyers. *Kennedy*, 299 S.C. at 341–44, 384 S.E.2d at 734–36 (rejecting a result in which "a builder who constructs defective housing escapes liability while a group of innocent new home purchasers are denied relief because of the

imposition of traditional and technical legal distinctions"; and explaining that in the past, when the Court is confronted with a new scenario "not properly disposed of by our present set of rules," it "[o]nce more[] respond[s] by expanding our rules to provide the innocent buyer with protection" (citing *Lane v. Trenholm Building Co.*, 267 S.C. 497, 229 S.E.2d 728 (1976))).  As we stated over thirty years ago, it is "intolerable to allow builders to place defective and inferior construction into the stream of commerce." *Id.* at 344, 384 S.E.2d at 736 (citing *Rogers v. Scyphers*, 251 S.C. 128, 135–36, 161 S.E.2d 81, 84 (1968)).  Thus, the fact that the arbitration agreement contained within the purchase and sale agreement involves the construction and sale of a new home is relevant to our analysis of this consumer transaction.

Generally, courts will not enforce contracts that violate public policy.  *Carolina Care Plan, Inc.*, 361 S.C. at 555, 606 S.E.2d at 758 (citation omitted).

> A refusal to enforce a contract on the grounds of public policy is distinguished from a finding of unconscionability; rather than focusing on the relationship between the parties and the effect of the agreement upon them, public policy analysis requires the court to consider the impact of such arrangements upon society as a whole.

17A Am. Jur. 2d *Contracts* § 238 (Supp. 2021) (citation omitted).  Public policy may be expressed in constitutional or statutory authority or in judicial decisions. *White v. J.M. Brown Amusement Co.*, 360 S.C. 366, 371, 601 S.E.2d 342, 345 (2004); *see also* 17A Am. Jur. 2d *Contracts* § 238 (2016) (explaining courts may consider, *inter alia*, the subject matter of the contract, the strength of the public policy, and the likelihood that refusal to enforce the challenged term in the contract will further public policy).

Given the pervasive presence of oppressive terms in the arbitration provision, we find the severability clause here, in an unconscionable, adhesive home construction contract, is unenforceable as a matter of public policy.  We are specifically concerned that honoring the severability clause here creates an incentive for Lennar and other home builders to overreach, knowing that if the contract is found unconscionable, a narrower version will be substituted and enforced against an innocent, inexperienced homebuyer.  *Cf.* Maria Kalogredis et al., *Addressing Increasing Uncertainty in the Law of Non-Competes*, Ass'n Corp. Couns. 36 (Apr. 2018), https://www.hangley.com/wp-content/uploads/2018/04/ Addressing-Increasing-Uncertainty-in-the-Law-of-Non-Competes.pdf (expressing a similar concern in the context of non-compete agreements); *Shotts*, 86 So. 3d at 478 (explaining it did not "make sense for a court to remake [the arbitration] agreement

to excise the offending provisions. Given the nature of the relationship between a nursing home and its patient, the courts ought to expect nursing homes to proffer form contracts that fully comply with [the law], not to revise them when they are challenged to make them compliant. *Otherwise, nursing homes have no incentive to proffer a fair form agreement.*" (emphasis added) (citation omitted)); *Richard P. Rita Pers. Servs. Int'l, Inc. v. Kot*, 191 S.E.2d 79, 81 (Ga. 1972) (declining to blue-pencil an overly restrictive non-compete agreement because it would encourage employers to "fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable. This smacks of having one's employee's cake, and eating it too." (quoting Harlan M. Blake, *Employee Agreements Not to Compete*, 73 Harv. L. Rev. 625, 683 (1960)))[12]; *see also Howard Schultz & Assocs. of the Se., Inc. v. Broniec*, 236 S.E.2d 265, 269 (Ga. 1977) ("It is these very requests which are the reason for rejecting severability of employee covenants not to compete. Employers covenant for more than is necessary, hope their employees will thereby be deterred from competing, and rely on the courts to rewrite the agreements so as to make them enforceable if their employees do compete. When courts adopt severability of covenants not to compete, employee competition will be deterred even more than it is at present by these overly broad covenants against competition.").

Moreover, we do not doubt that "for every [arbitration agreement] that finds its way to court, there are thousands that exercise an *in terrorem* effect on [homebuyers] who respect their contractual obligations." Kalogredis, *supra*, at 36

---

[12] We note that prior to 2012, Georgia courts prohibited blue-penciling non-compete agreements under the common law. However, in 2012, Georgia's legislature enacted sections 13-8-53 and 13-8-54, permitting—but not requiring—courts to blue-pencil such agreements. Ga. Code Ann. §§ 13-8-53(d) (2022) ("[A] court *may* modify a covenant that is otherwise void and unenforceable . . . ." (emphasis added)); *id.* § 13-8-54(b) (2022) ("[I]f a court finds that a contractually specified restraint does not comply with [the law], then the court *may* modify the restraint provision . . . ." (emphasis added)). Following the statutory enactments, Georgia courts have remained reluctant to modify overly burdensome non-compete agreements to make them enforceable, as "unreasonable restrictive covenants are against Georgia public policy." *Belt Power, L.L.C. v. Reed*, 840 S.E.2d 765, 770–71 (Ga. Ct. App. 2020) (finding significant that sections 13-8-53(d) and 13-8-54(b) gave the court discretion whether to blue-pencil an agreement, and upholding the trial court's refusal to blue-pencil the burdensome non-compete agreement in that case).

(quoting Blake, *supra*, at 682).  "Because most [homebuyers] simply comply with their [arbitration agreements] rather than challenging them in court, the argument goes, the law should provide a strong incentive for [home builders] not to overreach."  *Id.*

## C.

Given that the subject matter of the contract involves new home construction, and South Carolina has an extensive history of expanding its common law on contracts so as to protect new homebuyers, we find honoring the severability clause here—particularly because it goes to a material term of the arbitration agreement—would violate public policy.  Our holding is based primarily upon two factors.  First, the contract at issue is a contract of adhesion, in which it is "considerably doubtful" both parties truly intended a court to sever an unconscionable provision and enforce the remainder of the agreement.  Second, with respect to the public policy considerations inherent in this type of consumer transaction (homebuying), "the likelihood that refusal to enforce the bargain or term will further [public] policy" is, we hope, high.  *See* 17A Am. Jur. 2d *Contracts* § 238.

## VI.

In sum, we hold the court of appeals correctly limited the scope of the arbitration agreement to Section 16 of the purchase and sale agreement, in accordance with the *Prima Paint* doctrine.  However, while the court of appeals declined to address the matter, there are several unconscionable provisions within Section 16, the most egregious of which strips Petitioners of their ability to name the parties against whom they are asserting their claims in the arbitration proceeding.  Because this is a contract of adhesion, and because the transaction involves new home construction, we decline to sever the unconscionable provisions for public policy reasons.  It is clear Lennar furnished a grossly one-sided contract and arbitration provision, hoping a court would rescue the one-sided contract through a severability clause.  We refuse to reward such misconduct, particularly in a home construction setting.  We therefore affirm in part and reverse in part the decision of the court of appeals and reinstate the circuit court's denial of Lennar's motion to compel.  The matter is remanded to the circuit court.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**BEATTY, C.J., HEARN, FEW, JJ., and Acting Justice Blake A. Hewitt, concur.**